BRANCH BANK AT MONTGOMERY
v. CROCHERON, ET AL.

1. A rail road corporation, by its charter, was prohibited from emitting for circulation, any notes or bills; or to make contracts for the payment of money, except under its corporate seal, and then alone for debts contracted by it. The rail road corporation subsequently made a contract with the branch Bank of the State of Alabama at Montgomery, by which the latter agreed to receive in payment of debts, and pay out in circulation, such notes as the former should issue in payment of its debts. The rail road corporation issued certain bills single, in sums from one to twenty dollars, engraved as bank notes, in payment of debts due from it, and these were received by the Bank under its contract with the rail road corporation. Afterwards, the Bank loaned the bills single thus received on certain bills of exchange, at the request of the borrower; the bills being made for the purpose of effecting the loan. *Held*, that these transactions on their face were not illegal, so as to prevent the Bank from recovering in a suit on the bills of exchange. If the bills were lawfully issued by the rail road corporation, they could be lawfully received by the Bank, and again loaned by it. But if the contract was a mere pretext to avoid the prohibition of the charter, it would be void, and the bills single invalid in the hands of any one connected with the illegal contract. The validity, or invalidity of the transaaction, depends upon the intention with which the bills single were issued and received, and that is a question for the jury.

2. When a statute prohibits the making by any person or corporation of any note, bill single, &c. for a less sum than three dollars, to subserve the common uses of money and punishes the offence by fine; and the circulation is also punished by fine; the passing of such notes does not necessarily avoid a contract for the loan of money, when the contract is not for the loan of such notes. The rule is, that a contract with reference to the prohibited matter is void; but if the contract is

innocent, and in carrying it out, there is a violation of the statute, this does not avoid the contract, though the offender may be punished for a violation of the law.

3. An agreement by the Branch Bank of the State of Alabama, to receive such bills as a rail road company could lawfully issue, and to pay the same out as circulation, will not avoid a recovery on bills of exchange, given for the loan by the Bank of such bills, as being contrary to the policy of the laws of the State, with reference to its banking institutions.

WRIT of Error to the Circuit Court of Montgomery county.

This action is by the Bank, against the defendants, as parties to a bill of exchange. The defence relied on was, that its purchase was unwarranted by the charter of the Bank, and its consideration illegal and against public policy.

The facts were these: The Wetumpka and Coosa Rail Road Company, had frequently applied to the Bank for a loan, to enable it to carry on the contemplated improvements, but without success; it finally proposed to accept a loan in the notes of the Montgomery and West Point Rail Road Company, of which the Bank held a considerable amount, and this proposition was accepted, and the bill sued on, with several others, together amounting to $20,000, was discounted, and the proceeds paid in the notes of the Montgomery and West Point Rail Road Company, varying from one to twenty dollars. These notes were under the seal of the corporation, but bore the similitude of Bank notes, and were also made payable at the counter of the Bank. At the time of the discount, these notes were depreciated in the market from two to four per cent., but the Bank had taken them at their full value in payment of debts due to it, and was amply secured by the corporation issuing them.

These notes came into possession of the Bank in consequence of an agreement made with the Montgomery and West Point Rail Road Company, by which the former agreed to receive in payment of debts due to it, such notes as the latter should issue in payment of its debts. By this agreement, the Bank also undertook to pay these notes out as circulation, but none were so paid out or loaned, except those used in the transaction with the Wetumpka and Coosa Rail Road Company. The agreement extended only to such notes as the said company should issue in con-

formity with its charter, under the corporate seal, and for the pay ment of debts due by it.

The bill in suit was made in consequence of the agreement of the Bank to loan the Wetumpka and Coosa Rail Road Company the sum before mentioned, and had no other consideration to support it. The Bank was further secured by a mortgage of the Rail Road, and the property of the Company, for the payment of the bills discounted, but the mortgage is to secure the payment of the bills, and not for a loan of money, *eo nomine*.

It was also in evidence, that no notes had ever been issued by the Montgomery and West Point Rail Road Company, except under their corporate seal, and for debts contracted by the said corporation. These notes circulated as money at the depreciation before named.

Under this state of proof, the plaintiff requested the court to charge the jury,

1st. That if the Montgomery and West Point Rail Road Company had issued no notes except under its corporate seal, and for debts contracted by it, and that such notes formed the consideration of the bill sued on, then the said company had the right to issue such notes in any manner, form, stamp or amount it might think proper; and that the Bank likewise had the right, after such notes were so issued by the company, to receive them in payment of debts, and to pay them out again.

This charge was refused, and the court charged the jury, that the contract entered into between the Montgomery and West Point Rail Road Company and the Bank, to circulate the bonds of the former, was illegal in its inception; and if the bill sued on was received by the Bank as a security for a loan of money made by it to the Wetumpka and Coosa Rail Road Company, to be received in the bonds of the Montgomery and West Point Rail Road Company, obtained by the Bank by said contract, the plaintiff was not entitled to recover.

2d. That although the contract between the M. & W. P. Rail Road Company and the Bank, was illegal yet the defendant could not set up that as a defence to the action, nor that the Bank was prohibited by law from carrying on such a traffic.

3d. That although the Bank, by its charter may be limited to the dealing in specific matters, yet such limitations are directory only, and if they are departed from, a third party cannot set up

the departure as a defence to a suit by the Bank, but that the remedy must either be provided for by law, or the Bank proceeded against by a *quo warranto*.

4th. That if this was the only instance in which discounts had been made by the Bank with the notes of the Rail Road Company, and the discount had been made at the request of the defendants, it was not illegal, and was no defence to the suit.

These charges were severally refused, and the plaintiff excepted, as well to the charge given, as to those refused.

A verdict was found for the defendants, on which judgment was rendered. The plaintiff prosecutes this writ of error, and insists that the court erred in refusing to give the charges asked for, and also in that given.

ELMORE and HARRIS, for the plaintiff in error argued,

1. The Rail Road Company, by its charter is invested with authority to issue notes in payment of its debts. [Pp. acts, 1833, page.]

2. The Bank is not prohibited from making such a contract, or receiving such notes, [Digest 66; 8 Wheat. 349, to 351,] and could lawfully exchange them for bills. [9 Peters, 401; 7 Paige, 646.]

3. If, however, the notes were illegally received by the Bank, this constitutes no defence. [8 Wheat. 353; 2 Ala. Rep. 452; 9 Mass. 423; 16 ib. 94, 103; 3 Rand. 142; 2 Hall's Supl. 526; 3 Rand. 465.]

GOLDTHWAITE and HAYNE, *contra*, contended,

1. That this Bank is subject to the same rules of law as if it was a mere private corporation. [9 Wheat. 904; 11 Pet. 325.]

2. The contract between the Bank and the Rail Road Company is void. 1st, because it is unauthorised by the charter of the Bank. [3 Wend. 482; 15 John. 380; 1 Hall's Supl. 526; Angel & Ames on Corp. 145; 2 Conn. 678; 1 Hill, 11; 5 Conn. 561.] 2d, because it was in direct violation of the charter of the Rail Road Company. [Act of 1833 '4, page 119.] 3d, because it is against public policy—the banks of the State alone have the right to issue bills, and the issuance of small bills is expressly prohibited. [Digest, 110; 7 Paige, 653; 8 Ohio, 286.]

3. The bill of exchange was given for money, of which the is-

sue is prohibited by statute. [Acts of 1833 '4, p. 119; Digest 110; 7 Paige, 653; 8 Ohio, 286; 2 Cowen, 699; 8 Gill. & J. 318; 1 E. C. L. R. 268; 15 Johns. 383; 3 Wend. 482; Angel & Ames, 139, 2 Peters, 538; 13 Conn. 249.]

GOLDTHWAITE, J.—The rules of law by which the several charges given, and refused, by the circuit court, are to be tested, can be better considered by ascertaining what acts each of these corporations was authorised to perform, with reference to the matters in evidence.

The proviso of the 2d section of the charter of the Montgomery Rail Road Company declares, " that it shall not be lawful for the said corporation to use any part of its capital stock or funds for banking purposes, nor to emit, for circulation, any notes or bills, or to make contracts for the payment of money, except under its corporate seal, and then alone for debts contracted by it." [Acts of 1834, 119.]

From this, it will be seen, that although the Rail Road Company is permitted to make contracts for the payment of money under its corporate seal, for debts contracted by it, yet it is expressly prohibited from emitting any notes, or bills for circulation. I think the intention to forbid the emission of any paper evidence of debt for circulation as money, by whatever name the emission should be called, is perfectly clear, and that it makes no difference whether it is by means of notes, checks, drafts, bills single, bonds, or tokens. The terms *notes and bills*, are sufficiently comprehensive to include all those, and possibly, also every other sort of promises to pay. The intention being clear to prohibit the issuance of notes and bills, it is not easy to conceive why the emission of bonds, and bills single should not be considered as a mere evasion of the statute, because the same consequences to the community would flow from either act.

But as the corporation, in a certain event, is authorised to give out its obligations for the payment of money, as well as prohibited from emitting them as a circulation, it follows that the intention with which the issue is made, must enter into every emission, and that the act is lawful, or unlawful, as the intention may indicate; neither the amount of the obligation, its shape, manner of engraving, nor indeed any other circumstance of a similar kind, will render the emission a matter of law, to be determined by the

court; but the intention must be ascertained by the jury upon a view of the circumstances; and the mere indebtedness of the corporation will not authorise it to emit bills intended for circulation, although they may be given in the first instance to the creditor. The least consideration will shew that if the emission is made to depend on the indebtedness, it would continue to be perpetual, as the old emission is a debt and could be replaced at any time by a new one founded on it.

Then, as to the effect or consequences of making an emission for the purpose of circulating as money; we waive all examination of how far the franchise might be affected by such a misuser, because that is not now the question; but as to the parties connected with the unlawful emission, whether the corporation or its creditors, I think it is clear, both upon principle and authority, that neither the act itself, nor any contract with respect to it, is of any force in law. [Cannon v. Bryce, 3 B. & A. 179.] If bills single then were emitted by this corporation, although in payment of debts actually contracted, with the intention that the same should circulate as money; and this intention was concurred in by the creditor, they were void in his hands, and could not by him be enforced against the corporation, for both parties would in such a case, be equally guilty of the violation of the statute. So likewise they would be invalid in the hands of any other persons to whom they should come for the same purpose, and with the same concurrence of intention to violate the law.

There are limits, however, beyond which this rule ought not to be applied, especially too, where, as here, the prohibition of the statute extends only to a particular act. It will be seen that this *proviso*, does not in terms inhibit the actual circulation of, or make void such paper as shall be unlawfully emitted; and we think that public policy, when the whole enactment is considered, does not require such a construction to be given. Paper of a description precisely similar, may lawfully be issued by the corporation under certain circumstances, if it be free from the intention to make it a circulation. Now public policy does not require that each individual who is disposed to deal for paper, which at least is lawfully negotiable, should be put upon an inquiry into the intention with which it was made, when under this statute, it may be lawfully issued under some circumstances. It is the emission by the corporation for circulation, which is prohibited, and the

sanctity of the law is sufficiently vindicated, by declaring the paper void in the hands of one immediately connected with the illegal act. The legislature too had not thought proper to prohibit the circulation of paper like this, when this transaction took place, nor are we authorised to say that it is so entirely valueless as to furnish no foundation for a suit in the hands of a *bona fide* holder, innocent of any connexion with the illegal act of emission, and perhaps even beyond this it may be considered as valid, if the immediate holder can trace his title as well as a legal consideration paid to a *bona fide* holder, who himself might have recovered, although the one to whose hands it ultimately comes, may have assisted or aided in the illegal issue of similar paper.

Another statute is supposed to have a material bearing upon a portion of the facts connected with this case, and must therefore be considered. It is the act of 1830, [Digest, 110, § 52,] which renders it unlawful for any person, or corporation to make any note, bill single, &c. for a less sum than three dollars, to subserve the common purposes of money, and punishes the making with a fine of not less than fifty, nor more than two hundred dollars; this statute also directs the punishment of those who pass off, circulate or aid in the circulation of any such note, bill single, &c., by a fine not less than five nor more than twenty dollars.

The rule of decision under this statute, is similar to the one we have just considered. Whenever a contract is made with reference to any matter which is in violation of a statute, the contract itself is void; but if the contract itself be innocent, and in carrying it into effect a violation of the law arises, either by ignorance or mistake, the contract remains good, although the offender may be punished for the violation of the law. To illustrate this rule : if a contract is made for the loan of money, without reference to the kind, and in payment such bills as are prohibited, are given and received for a part, the contract is not avoided, as it would be if even the smallest sum was contracted to be received in this prohibited kind of money. Indeed, it would be monstrous to hold that the payment of a prohibited bill upon a contract, without reference to such money, would avoid the security given for it. The rule is very fully illustrated in a variety of cases; thus, if a druggist sells drugs to a brewer, with the knowledge that they are to be used to adulterate beer, in violation of a statute, the contract is void, although it would be innocent in the ab-

sence of the knowledge of the one intended to be made. [Lang-lee v. Hughes, 1 M. & S. 593.] So, likewise, goods sold with the knowledge of the intention of the purchaser to violate the revenue laws.

Here, the contract was not made with reference to loaning bills of the Rail Road Company of any particular denomination, and it is shown that some of them was for greater sums than three dollars. There is no pretence that the contract was made with a view to the violation of this statute, and therefore, although the Bank may be liable for its violation, the contract is not for that cause, a void one.

It is also supposed that the contract by which this bill was purchased, is void as against the policy of the several acts creating Banks in this State; but this objection may be dismissed, with the single remark, that if the bills single, when held by the Bank, were available to it, and could then have been recovered from the Rail Road Company, they constituted a sufficient consideration for the purchase of the bills of exchange, for such a transaction is nothing but an exchange of one kind of paper for another. The question is not whether the Bank would be permitted to insist on the taking of the bills single, when the contract was for a loan of money, but is, whether it is lawful to exchange one lawful and valuable kind of paper for another, at the request of a party who seeks to be benefitted by that precise transaction. If the contract is free from difficulty on the other points, we think it is on this.

Having ascertained these principles, there is no difficulty in the conclusion, that the Circuit Court erred in the charge given to the jury, in reference to the first instructions which the plaintiff requested, inasmuch as it then undertook to declare the contract between the Bank and the Montgomery Rail Road Company, void, in point of law, from its inception. We have already shewn that this was a question to be determined by the jury under all the circumstances of the case. The contract of the Bank, in terms, only applies to such notes as the Rail Road Company should lawfully issue; and such it was lawful for the Bank to receive in payment of its debts; and, if it thought proper, to again put in circulation. But if on the contrary this contract was a mere contrivance to enable the Rail Road Company the better to evade the *proviso* by circulating its own bills as money, although

they might be paid out in payment of debts before contracted, this concurrence of intention, and aid in the unlawful act, would render this contract void. If, beyond this, it was shown that these bills single were put in circulation in violation of the statute, then it would devolve on the Bank to show that it received them from a *bona fide* holder, capable of maintaining a suit against the corporation issuing them.

The consideration already given this case will probably be sufficient for its correct decision, and therefore we omit the examination of those charges which were refused.

Let the judgment be reversed, and the cause remanded.

COLLIER, C. J.—I concur with my brother GOLDTHWAITE, in reversing the judgment of the Circuit court. But as it is unnecessary to determine whether bills or notes illegally issued could be collected by a *bona fide* holder, for a valuable consideration, without notice ; or whether one conusant of the illegal issuance, but receiving the bills or notes from a *bona fide* holder ignorant of the violation of law, may enforce payment, I decline an expression of opinion on these points.

ORMOND, J.—I concur in the judgment of reversal, with the reservation expressed by my brother COLLIER.