## TANNIS *vs.* DOE EX DEM. ST. CYRE.

1. At common law, the right to inherit was dependent upon the duties which devolved on the natural-born subject, in return for the protection supposed to be afforded him by the sovereign, and sprang directly from the obligation of fealty, which, under the feudal system, was required of the vassal; and, although the reasons on which the rule was founded have in a great measure ceased, yet the rule still exists, and under its operation all persons entitled to take by inheritance at the common law possess the same right in this State, unless inhibited by our statutes, either expressly or by necessary implication.

2. Previous to the act of February, 1832, a free negro might inherit lands in this State; whether he can inherit where the descent was cast upon him after the passage of that act, and he was not a resident of this State on the first of February, 1832, *quaere ?*

3. A slave who was emancipated prior to the passage of the act of 1834, (Clay's Digest, 545, §§ 37, 38,) may hold lands in this State.

4. A free negro, who was an inhabitant of Florida at the date of the treaty by which Spain ceded that territory to the United States, lost the character of an alien, by the operation of that treaty, and would be entitled to take lands by descent in the United States, if not incapacitated by the laws of the State in which the lands were situated.

5. A copy of a deed is not admissible in evidence, upon proof made to the court, that the executor of the grantee had searched for the original, and had not been able to find it; that after the grantee's death, his son had carried off, to a place in the country where the grantee had been living, a small trunk containing his father's papers which the executor had not searched; and that the executor had made verbal application to him, both for the trunk and for the deed.

ERROR to the Circuit Court of Mobile.

Tried before the Hon. L. GIBBONS.

EJECTMENT by Lucy St. Cyre against the plaintiff in error, to recover a certain lot, situated in the city of Mobile, which the plaintiff claimed as the sister and heir at law of one Cyrus Evans, a free man of color.

The plaintiff introduced evidence showing that the only child of said Cyrus was a slave, and that his brothers and sisters, with the exception of herself, were either dead or slaves; that the plaintiff was a slave at her birth, but was emancipated under the Spanish law about the year 1818, at which time she was a resident of Florida; and that she was found residing in Alabama, after the treaty of cession of 1819, by which the United States acquired Florida.

To let in secondary evidence of the contents of a deed from Joshua Kennedy to said Cyrus Evans, for the lot in controversy, the plaintiff proved to the court, by the executor of said Cyrus, that after the death of said Cyrus he had searched for the original deed, and had been unable to find it; that, soon after the death of said Cyrus, his son Alfred had carried off, to a place in the country where said Cyrus had been living, a small trunk containing his father's papers, which the executor had never searched; that the executor had made application to said Alfred, both for the trunk and for the

deed, and had not been able to obtain either. Upon this proof, the court admitted in evidence a registered copy of the deed; and the defendant excepted.

The court charged the jury, "that a negro could hold real estate in Alabama; and if they believed that Cyrus Evans was free, and the plaintiff also was free, she would inherit his property, if the jury should also find that the only child of said Cyrus was a slave, and his other brothers and sisters were either dead or slaves;" to which charge the defendant excepted.

The admission of the copy of the deed in evidence, and the charge given, are assigned for error.

JOHN A. CUTHBERT, for plaintiff in error.

W. BOYLES, contra.

GOLDTHWAITE, J.—The first question presented by the counsel for the plaintiff in error, is, as to the right of the defendant in error, as a free person of color, to inherit lands in this State. At the common law, the right to inherit was dependent upon the duties which devolved on the natural-born subject, in return for the protection supposed to be afforded him by the sovereign, and sprung directly from the obligation of *fidelitas*, or fealty, which, under the feudal system, was required from the vassal. 1 Black. Com. 366; 2 Kent's Com. 57. The reasons which operated in the establishment of the rule have, in a great measure, ceased; but the rule still exists, and under its operation all persons entitled to take by inheritance at the common law possess the same right in this State, unless inhibited by our statutes, either expressly or by necessary implication. It is not pretended, that there is any express inhibition under the laws of this State; but it is insisted, that the disability results from the legislative enactments which, from time to time, have been adopted in relation to this class of individuals, the spirit of which is said to be in hostility to the exercise and enjoyment of this right by them.

In the absence of any constitutional provision, regulating the course of legislation, it is a matter of difficulty, as well as of some delicacy, to determine upon questions of State policy.

Questions of this character should be determined by the State itself; and most certainly in all cases in which a court is called upon to declare that an important rule of property, recognized by the general law in force, is abrogated and repealed, as being contrary to the policy of the State; at least the indications of such policy, as furnished by the voice of the sovereign power, should be clear and certain. In other words, the right which is given by the general law, must be plainly and obviously inconsistent with the existing statutes; and if, upon a just interpretation of the latter, the two can exist together, the intention of the legislature that they should both exist, is to be presumed; and this court could not, with any propriety, in such a case, by the repeal of the rule, give effect to its own views of State interest, or State policy. Such a course would be legislative, rather than judicial interpretation.

No certain, or even definite conclusion, as to the policy of the State in relation to the toleration of free negroes within its limits, can be drawn from the constitutional provision in relation to the emancipation of slaves. The framers of that instrument unquestionably looked forward to the time, when the indiscriminate and uncontrolled exercise of the power of manumission by our own citizens, might bring with it evils of sufficient magnitude to require some restraint to be laid upon that power. But the provisions in relation to this object were prospective merely, and properly entrusted the entire subject of emancipation, within the State, to legislative discretion, to be exercised as the future interest or policy of the State might require. There is no constitutional provision, as to the right of free persons of color to come into the State; and it was not until February, 1832, that the accumulation of this class of population within our territorial limits, was regarded as an evil sufficient to demand legislative interposition. By the act of 1832, the immigration of free persons of color into the State was prohibited, under severe penalties; but its provisions applied only to individuals of that class who came into the State after the first of February of that year; and the discrimination thus made by the terms of the act is conclusive, to show that those who were not embraced by its provisions were not subject to its penalties, and, as a necessary

consequence, possessed all the rights which they possessed previous to its enactment. If the action of the legislature is to be regarded as a correct exposition of State policy, the expression of the legislature, defining the limits of such action, is equally conclusive, as to the extent to which that body intended the policy should be pursued; and having, in the present instance, virtually exempted from the operation of the laws directed against free persons of color, those who came into the State prior to 1832, no argument founded on the policy of the law can be maintained against those who are so situated. The charge of the court, therefore, that a negro could hold and inherit lands, was, as a general rule, correct; and if the plaintiff in error wished a more particular direction, to point it to a case where the descent was cast upon a free person of color who was not a resident of the State on the first day of February, 1832, he should have applied to the court for a special charge to meet that case.

It will be observed, that we do not decide the question as to the right of a free person of color to inherit lands in this State where the descent was cast since the passage of the act of 1832, and the heir was not a resident of this State on the first day of February of that year. That question does not necessarily arise upon the record; and the facts of the case, as presented by the bill of exceptions, render it improbable that it can arise upon any future trial of the case.

It is urged, however, that, if the policy of the law does not exclude the defendant in error, as a free negro, from the right to recover, yet, by the disability impliedly annexed to her condition as an emancipated slave, she is denied the right to hold lands in that capacity. We doubt whether this question properly arises upon the record, in the absence of any specific instruction on this point requested by the plaintiff in error; but, as the case must be reversed on another ground, and as the same question must necessarily arise upon another trial, it is perhaps proper that the point, so far as it is necessary to the determination of this case, should be decided; and upon this branch of the argument, it is sufficient to remark, that, previous to the act of 1834, (Clay's Digest, 545, §§ 37, 38,) there was no law which required the slave to leave the State, either after, or to complete, the act of emancipation. The act

of 1834 not only denied effect to the act of emancipation until the slave left the State, but secured the community against his return, by the infliction upon him, in that event, of servitude for life. If this act is considered as indicative of the policy of Alabama not to allow emancipated slaves to remain in the State, without reference to the State where their manumission was effected; still, there is no rule of construction, by which it could be applied to slaves who were emancipated before its passage, and the defendant in error would, therefore, be exempted from its operation.

We have considered the questions presented, involving the disability of the defendant in error, as depending upon the statutory provisions applicable to individuals of her *status* or condition, for the reason, that we know of no other principle on which to rest it. It is conceded, that there may be cases in which the right of the individual to hold and enjoy property may be denied, in the absence of any legislative provision; as in the case of slaves, where the right to make contracts, or to hold property, is in direct conflict with their condition, from which a civil disability necessarily results. But no such incapacity attaches to a free person of color, or to an emancipated slave; and it can only be fixed upon them by express legislative enactment, or by necessary implication.

The only remaining disability which is urged against the defendant in error, is, that of alienage. The evidence upon this point shows, that she was born in Florida, when that State belonged to a foreign power, and that she remained an inhabitant of that territory up to 1818. On the 2d of February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession, is as follows: "The inhabitants of the territories which his Catholic Majesty cedes to the United States by this treaty, shall be incorporated into the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the rights, privileges and immunities of the citizens of the United States." This treaty is the law of the land; and, by its terms, the inhabitants of Florida were admitted to the privileges, rights and immunities of American citizens. But if the treaty contained no such clause, we entertain no doubt that, by its operation, the inhabitants of Florida at the time

of its execution would be enabled to hold lands in the United States. The effect of the treaty was not only to transfer the ceded territory, but the allegiance of its inhabitants, to the United States. There was a change of sovereignty, and the allegiance due from the inhabitants of Florida to the crown of Spain was, by the act of transfer, abandoned by that power, and transferred to the United States; and, as the right to inherit depends upon the state of allegiance at the time of descent cast, (Dawson v. Godfrey, 4 Cranch, 321,) it follows, that if the defendant in error was an inhabitant of Florida on the 2d of February, 1819, she lost the character of an alien, by the operation of the treaty of that date, and would be entitled to take lands in the United States by descent, if not incapacitated by the laws of the State in which the lands were situated. The evidence as stated in the bill of exceptions, shows, that the defendant in error was born in Florida before the treaty of cession, and of course the fact of alienage depended upon her being an inhabitant of that territory at the date of the treaty; but on an examination of the record it will be found, that the charge of the court was based entirely upon other portions of the testimony, with reference to which it was strictly correct.

The admission, however, of the registered copy of the deed from Joshua Kennedy to Cyrus Evans, we regard as erroneous. The evidence submitted to the court, as the preliminary for its admission, raised a strong presumption that the original deed was in the possession of the boy Alfred; and the only diligence shown to have been resorted to was, the verbal application to him by the executor of the grantee. There can be no fixed rules applicable to cases of this character; but the party relying upon the written evidence should at least be required to show, that he has, in good faith, and to a reasonable degree, exhausted those means which were in his power, and which would probably result in the production of the deed. If Alfred was a slave, application should have been made to his master or owner; and if he could not be found, or was unknown, that fact should have been shown to the court. If he was free, a subpœna *duces tecum* would probably have been effectual. But a mere verbal application to

the probable possessor, whether bond or free, we do not think was sufficient.

For this error, the judgment must be reversed, and the cause remanded.