## Ewell et al. vs. Tidwell, Exr.

Where it does not appear from the record, that the laws of another State—the civil code of Louisiana—were read in evidence in the Court below, they cannot be noticed in this Court on appeal.

Where a mortgager of slaves remains in possession after default of payment, the mortgagee has the same time to bring a bill to foreclose and sell, that is allowed him, under like circumstances, to commence an action at law for the possession of the slaves; and the limitation to such action is three years. (*Sullivan vs. Hadley*, 16 *Ark.* 129.)

The previous decisions, that the peaceable, adverse possession of negroes for five years, gives title under the statute (*secs.* 3 *and* 4, *p.* 1026, *Dig.*,) approved.

Under our constitution and laws, a court of chancery has no jurisdiction to declare a will void for fraud in obtaining it.

Free negroes are permitted, under the laws of this State, to hold real and personal estate, except negroes, and to make contracts; but it is against public policy that they should own slaves.

### Appeal from Bradley Circuit Court in Chancery.

Hon. THEODORIC F. SORRELLS, Circuit Judge.

JAMES YELL, for the appellants.

GOULD and CUMMINS & GARLAND, for the appellee.

Mr. Justice COMPTON delivered the opinion of the Court.

This was a bill in chancery exhibited in the Bradley Circuit Court, on the 5th October, 1853, by John Ewell and Martha Ann, his wife, in their own right, and the said Martha Ann as the administratrix of the estate of Lorenzo D. Lewis, her former husband, and as tutrix of her two children, Richard M. and Mary Emma Lewis, infant heirs at law of the said Lorenzo

D., and who also sue by their next friend, *James Yell*, against *Eli J. Tidwell*, as executor of the last will and testament of *John Kolen* or *Jonathan H. Koen*, deceased, and the following negroes, *Betsey*, *Clarissa*, *Hannibal*, *Eveline*, *Sally*, *Osborn*, *Raligh*, *Emily*, *Albert*, *Rasha*, *Miranda*, *Mary*, *Tempee*, *Charles* and *Edmund*, all of whom, except Charles and Edmund, claim to be emancipated by the will of *Koen*.

The object of the bill, it would seem, was to have the will of Koen set aside for fraud in obtaining it, and the negroes declared to be the property of complainants, and delivered to them by the executor. The defendants answered, and among other grounds of defence, pleaded and relied, in their answers, upon the statute of five years; (*Digest, chap.* 162, *secs.* 3 *and* 4,) and also the general statute of limitations of three years.

The cause being heard on the pleadings and proof, the bill was dismissed, and a decree entered against complainants for costs, from which they appealed.

The complainants claim title to the negro defendants upon three distinct grounds.

1st. The bill charges that the negroes were not the property of the testator, *Koen*, at the time of his death, in 1853, but were then the property of complainants, alleging in support of this charge, that in 1840, *Koen*, who was then a citizen of the State of Louisiana, became the natural tutor of his daughter, Mrs. Ewell; that as such tutor, he took into his possession property to the value of about $4,800, which had descended to her from her deceased mother; and that Koen, about that time, in order to secure to Mrs. Ewell the amount thus in his hands, executed to her a mortgage on most of the negro defendants. The answers admit the liability, as stated in the bill, and the execution of the mortgage to secure it; but allege, in avoidance, that in 1846, and while Mrs. Ewell was the wife of Lewis, her former husband, a settlement was made between Koen and Mrs. Ewell, touching his liability to her as tutor, to which Lewis was a party, and in which he assisted; and that by that settlement the mortgage from Koen to Mrs. Ewell, was

9

in all things, fully paid and satisfied. As evidence of this, a paper writing, duly proven, is exhibited with the answers, which taken in connection with other proof in the cause, bearing on this point, abundantly establishes the satisfaction of the mortgage, which, according to the decisions of this Court in *Cornish vs. Dews, et al.* 18 *Ark.* 172, discharged the negroes from the incumbrance.

It is insisted, however, by the counsel for the complainants, that the settlement was irregular and invalid as to Mrs. Ewell, under the laws of Louisiana, where it was made, and in support of this proposition we are referred to the civil code of that State. It does not appear from the record that the civil code was read in evidence in the Court below, and for that reason it cannot be noticed here. But whatever may have been the law of Louisiana regulating such settlements, and however invalid the one under discussion may have been, it was held by this Court in *Sullivan vs. Hadley,* 16 *Ark.* 129, that where a mortgage is upon slaves, and the mortgager continues in possession after default of payment, the mortgagee has the same time to bring a bill to foreclose and sell, that is allowed him under like circumstances, to commence an action at law for the possession of the slaves; and the limitation to such action is three years. The testimony in the case before us clearly shows that the settlement was made in October, 1846, that *Koen* was then in possession of the negroes, and continued to hold them in possession, *as discharged from the incumbrance,* from thence to the time of his death, 1853: so that, conceding the invalidity of the settlement, the right to the possession of the negroes, or a decree of foreclosure and sale, was barred by the statute of limitations.

In no possible view could the Court have done otherwise than deny the relief sought upon the first ground assumed in the bill.

2d. The complainants assert title to the negroes under Lorenzo D. Lewis, deceased; to sustain which, the bill further charges that Koen, while a citizen of Louisiana, became em-

barrassed—that, at the suit of creditors, execution was issued and levied on most of the negroes in controversy; that on the 8th of May, 1843, the negroes were sold under the execution, and one Charles Capel became the purchaser, who afterwards sold them to Lewis, the intestate, and former husband of Mrs. Ewell, and the father of the infant complainants; and that Lewis, after his purchase from Capel, loaned the negroes to *Koen*, who, in fraud of his creditors, and the rights of Lewis, clandestinely removed them to the State of Arkansas, where, concealing his residence, he continued to possess them until the period of his death in 1853.

The answers, as to this point, allege that, admitting it to be true that the negroes were bought by Capel at execution sale, and by him sold to Lewis, as charged in the bill, Lewis, nevertheless, afterwards relinquished and conveyed all his interest in the negroes to *Koen;* and deny that Koen held possession of the negroes under a loan from Lewis, or that he secretly removed them from Louisiana to Arkansas, and concealed his residence, in fraud of his creditors and the rights of Lewis. The defendants also rely upon the five years limitation act, above alluded to, as a bar to the recovery thus sought by the complainants under Lewis.

We are satisfied, from the testimony in the cause, that the purchase of the negroes by Capel at public sale, and the purchase by Lewis from him, were made for the benefit of *Koen;* and, although there is some confusion in the proof as to the execution of the formal instrument by which Lewis conveyed the negroes back to *Koen*, yet it is clearly shown that, in the settlement made between Lewis and wife and *Koen*, in 1846, all the demands then subsisting between *Koen* and Lewis were embraced, expressly including the consideration paid by Lewis to Capel for the negroes, and which was in the settlement *arranged* and *paid* by Koen to Lewis; that at the date of this settlement, Koen was in possession of the negroes, and so continued up to the time of his death, in 1853; that after making the settlement, and before his removal to Arkansas, he resided,

for the space of nearly two years, in the immediate vicinity of Lewis; that his intention to remove to a distant parish was generally known for months before his departure—Lewis, his neighbor and relation, being fully advised of it; that Koen left with the negroes publicly; that Lewis set up no claim to them, made no contract for their hire, and had no understanding with Koen as to how he should hold them.

These acts are consistent with the fact that Koen held the negroes, adversely, and in his own right, as he doubtless did, and are wholly inconsistent with the notion that Lewis had any claim to them whatever. And, besides this, the peaceable, adverse possession of the negroes for five years after the passage of the act of December the 19th, 1846, (*Dig.*, *p.* 1026, *secs.* 3 *and* 4), was a complete bar to the relief sought by the complainants, as the administratrix and heirs at law of Lewis.

3d. The third and last ground upon which the complainants claim title to the negroes, is set forth in the bill, substantially, as follows: That Mrs. Ewell is the only child and heir at law of the testator, Jonathan H. Koen; and that the testator, on his arrival in the State of Arkansas, changed his name to *John Kolen*, and by that name made his will, with the view of defrauding his creditors in Louisiana, where he was known by his true name only, and also to prevent the complainants from identifying him, or the negroes, after his death, so as to assert their title to the property; and it is insisted that these facts disclose a fraud sufficient to confer jurisdiction on a Court of equity to declare the will void, and set it aside.

Saying nothing about the novelty of defrauding creditors by last will and testament. as alleged in the bill, we will enquire whether, under our constitution and laws, a Court of Chancery has jurisdiction to declare a will void for fraud in obtaining it.

The constitution ordains that, until the General Assembly shall deem it expedient to establish Courts of Chancery, the Circuit Courts shall have jurisdiction in matters of equity, subject to appeal to the Supreme Court, in such manner as may be prescribed by law. See *sec.* 6, *Art.* 6.

It was held in this Court, in *Hempstead & Conway vs. Watkins, adm'r of Byrd*, 1 *Eng*. 317, that, "by this section, such jurisdiction in matters of equity as a Court of Chancery could properly exercise at the time of the adoption of the constitution, is conferred upon the Circuit Courts, until the General Assembly shall deem it expedient to establish Courts of Chancery." The Legislature not having established separate Courts of Chancery, and by enactment enlarged our chancery jurisdiction, and, inasmuch as the constitution confers upon the Circuit Courts equitable jurisdiction of such matters only as were properly cognizable in a Court of Chancery, at the time of the adoption of the constitution, it becomes necessary to extend our enquiries outside, and ascertain the rule of jurisdiction, in respect to the subject matter under consideration, in the light of the authorities. In *Gaines & Wife vs. Chew et al.,* 2 *How. U. S. Rep.* 645, this question came before the Supreme Court of the United States, and was much discussed. Mr. Justice McLEAN, in delivering the opinion of the Court, says: "Formerly, doubts were entertained whether Courts of equity could not relieve against a will fraudulently obtained; and it seems there are cases to be found where chancery has exercised such a jurisdiction. (Citing) *Munday vs. Munday*, 1 *Chan. Rep.* 66; *Welly vs. Thornale, Prec. Chanc.* 123; *Goss vs. Tracy*, 1 *P. Williams* 287; 2 *Vern.* 700. In other cases, such a jurisdiction has been disclaimed, though the fraud was fully established as in *Roberts vs. Wynne*, 1 *Chan. Rep.* 125; *Archer vs. Moss*, 2 *Vernon* 8. In another class of cases, the fraudulent actor has been held a trustee for the party injured. (citing) *Herbert vs. Lownes*, 1 *Chan. Rep.* 13; *Thynn vs. Thynn*, 1 *Vernon* 296; *Devenish vs. Baines, Prec. Chan.* 2; *Barnesly vs. Powell*, 1 *Ves.* 287; adding: "These cases present no very satisfactory result, as to the question under consideration. But since the decision of *Kendrick vs. Brumley*, 3 *Brown's P. C.* 358, and *Webb vs. Cleverden*, 2 *Atkyns* 424, it seems to be settled in England that equity will not set aside a will for fraud and imposition. The reason assigned is, when personal estate is

disposed of by a fraudulent will, relief may be had in the Ecclesiastical Court; and at law, on a devise of real property." (citing) *Bennett vs. Vade*, 2 *Atkyns* 14; *Geugoll vs. Horne*, 9 *Sim.* 539; *Jones vs. Jones*, 3 *Mer.* 171.

In the last case, the master of the Rolls says, " it is impossible at this time of day, it can be made a serious question whether it be in this Court that the validity of a will, either of real or personal estate, is to be determined." The same learned Judge, in the same opinion, proceeds to add: " In cases of fraud, equity has a concurrent jurisdiction with a Court of law, but in regard to a will charged to have been obtained through fraud, this rule does not hold. It may be difficult to assign any very satisfactory reason for this exception. That exclusive . jurisdiction over the probate of wills is vested in another tribunal, is the only one that can be given."

That the doctrine laid down in *Gaines & Wife vs. Chew et al.*, *supra*, founded, as that case seems to be, upon the English authorities, is that which obtains most generally in this country, is manifest, *vide Gould vs. Gould*, 3 *Story's Rep.* 537; *Lyne vs. Guardian*, 1 *Missouri* 290; *Swain vs. Gilbert et al.*, 3 *Ib.* 245; *Turver vs. Tarver*, 9 *Pet.* 180; *Story's Eq.*, *vol.* 1, *sec.* 184, *and note.*

The rule, then, that a Court of equity has no jurisdiction to set aside a will for fraud in obtaining it, is well settled. In this State, such jurisdiction is vested in the Probate Courts. *Vide sec.* 10, *Art.* 6, *Const.; Gould's Dig.*, *p.* 312, *sec.* 2, and *p.* 1076, *sec.* 16; and, also, in the Circuit Courts, upon petition for an issue to try the validity of the will. *Gould's Dig.*, *p.* 1078, *sec.* 32, *and sections following:*

It is insisted in argument, however, that though the complainants are not entitled to relief upon the main grounds assumed, still, the Court below erred in dismissing the bill as to Ewell and wife; insisting that *Koen*, the testator, died intestate as to a part of the property in controversy, and that Mrs. Ewell, as his sole heir and distributee, is entitled to it. To this proposition we yield our assent. The negro defendant, Ed-

mond, was neither emancipated nor disposed of by *Koen's* will. He claimed his freedom outside of it; and the proof shows him to be a slave; consequently, as to him, *Koen* must be regarded as having died intestate.

Whether he may be considered as having died intestate as to any other part of his estate, depends, in the present attitude of the controversy, upon the legal capacity of free negroes to hold property. *Koen*, by his will, after providing for the payment of his debts, and a specific legacy of five dollars to Mrs. Ewell, bequeathed to certain negroes (whom the will declares to be free), the *residium* of his estate; consisting of lands, the negro defendant, Charles, and other personalty.

It is contended that, as a matter of public policy, free negroes should not be permitted to own property of any description, and *Bryan vs. Walton*, decided by the Supreme Court of Georgia, (*vide* 14 *Geo.* 187; 20 *Ib.* 508), is cited and relied on as an authority in point. In that case the Court did not base its decision upon grounds of public policy, but decided that the emancipation of a slave did not confer upon him the power to make a contract, but merely gave him the right of free locomotion. In this, however, we do not concur. The negro, though morally and mentally inferior to the white man, is, nevertheless, an intellectual being, with feelings, necessities and habits common to humanity. By the act of emancipation, the reciprocal obligations and duties between master and slave, by which the slave owes obedience and fidelity to the master, and the master owes to the slave support and protection, are ended. When this takes place, no one is interested in the protection of the negro. If, under such circumstances, he could not make and enforce contracts, it is difficult to understand how he could, with any certainty, supply his commonest necessities. Such a condition would be inconsistent with civilization   And, besides this, the negro, having no power to acquire property, or certain means of gathering the fruits of his labor, every incentive to industry would be at once destroyed; and, sinking into idleness and depravity, he would become an intolerable nuisance.

In several of our sister States, it has been held, as we think correctly, that free negroes may own lands and make contracts. *Vide Hepburn vs. Dundas,* 13 *Gratt.* 219; *Tannis vs. Doe,* 21 *Ala.* 449; *Davis vs. Elliott's Administrators,* 5 *Flor.* 261.

But when we come to consider whether a free negro can own a slave, we have a different question.

Without attempting to discuss slavery in the abstract, it may be said that it has its foundation in an *inferiority of race.* There is a striking difference between the *black* and *white* man, in intellect, feelings and principles. In the order of providence, the former was made inferior to the latter; and hence the bondage of the one to the other. For government and protection, the one race is dependent on the other. It is upon this principle alone, that slavery can be maintained as an institution. The bondage of one negro to another, has not this solid foundation to rest upon. The free negro finds in the slave his brother in blood, in color, feelings, education and principle. He has but few civil rights, nor can have, consistent with the good order of society; and is almost as dependent on the white race as the slave himself. He is, therefore, civilly and morally disqualified to extend protection, and exercise dominion over the slave.

So, it may be laid down as a rule, that the ownership of slaves by free negroes, is directly opposed to the principles upon which slavery exists among us, is subversive of all police regulations for the good government of our slave population, and is, therefore, contrary to public policy. See *Tindall vs. Daniel,* 2 *Har.* 441; *Davis vs. Evans,* 18 *Mo.* 249.

From these views, it follows that *Koen,* the testator, died intestate as to the boy Charles also.

Leaving the validity of the will, and the question of freedom consequent on it, to be contested by the proper parties, in the proper forum, the decree of the Court below must be reversed as to Ewell and wife, and affirmed as to the other complainants, they paying one half the costs and the appellee the other; and the case remanded with directions to decree the two

negroes, Edmond and Charles, to Ewell and wife, in distribution, after the payment of the debts of *Koen*, and the expense of administering his estate.

Absent, Mr. Justice RECTOR.