## SCHEIBLE *vs.* BACHO.

[BILL IN EQUITY FOR CANCELLATION OF MORTGAGE, OR REDEMPTION.]

1. *Status of Confederate and State governments during late war.*—On principles of international law, the governments of the Confederate States and of the State of Alabama, during the late war in the United States, were governments *de facto*.

2. *Validity of contract made within Confederate States during war.*—The validity of contracts made within the territorial jurisdiction of the Confederate States, during the late war with the United States, must be tested by the constitution and laws of the governments *de facto* which then existed in that jurisdiction, and not by the constitution and laws of the United States.

3. *Enforcement of executory contract, based on loan of Confederate States treasury-notes.*—An executory contract, based on a loan of Confederate States treasury-notes, being valid by the *lex loci contractus* at the time it was entered into, may now be enforced in the courts of this State, acting under the constitution and laws of the United States; although the issue of such notes by the Confederate States was in contravention of the policy and interests of the United States; and although the use of such notes, in private contracts between citizens, remotely contributed to the furtherance of the original illegal purpose for which they were issued. (BYRD, J., *dissenting*, held—1st, that the ordinance of secession, adopted in Alabama on the 11th January, 1861, was a nullity; 2d, that the constitution of the United States was, in legal contemplation, in

force throughout the whole country during the war; 3d, that the validity of all contracts, now sought to be enforced through legal tribunals, must be determined by reference to the laws and policy of the United States; 4th, that the issue of treasury-notes by the Confederate States, to circulate as money, was contrary to the laws and policy of the United States, and the circulation of such notes as money, or as the basis of contracts, was equally illegal, and contrary to public policy; and, 5th, that executed contracts, though based on such treasury-notes, should not now be disturbed by the courts.)

4. *Ordinance No. 26, approved Sept. 28, 1865, as to parol evidence showing consideration of contracts, held applicable to chancery suit for redemption.*— A bill in equity, for redemption under a mortgage, is within the provisions of the third section of the ordinance adopted by the State convention on the 28th September, 1865, (No. 26,) which declares, "that in all suits upon contracts made between the 1st September, 1861, and the 1st May, 1865, parol evidence shall be admissible to prove what was the consideration thereof, and whether or not the parties thereto understood or agreed that the same should be discharged by a payment in Confederate currency or treasury-notes; and if so, or if it appears so from the contract, then to show what was the real or true value of the consideration of the said contract, and what amount the plaintiff is legally, justly, and equitably entitled to receive according to the contract, by the judgment of the court."

5. *Same; construction and validity of.*—To authorize the reduction of a debt under this section of said ordinance, it must not only be shown that the consideration was Confederate currency, but also that there was an agreement or understanding, express or implied, that the debt might be discharged in such currency; and thus construed, the ordinance simply changes a rule of evidence, and does not impair the obligation of contracts.

APPEAL from the Chancery Court at Mobile.

Heard before the Hon. N. W. COCKE.

THE bill in this case was filed, on the 31st August, 1865, by Henry L. Bacho, against Frederic K. Scheible; and sought the cancellation of a mortgage, and of the note which it was given to secure; or a redemption under the mortgage, in the event it should be held valid, and an account; also, an injunction of an action at law, which the defendant had instituted to recover the possession of the mortgaged premises, and general relief. The mortgage, which was made an exhibit to the bill, was executed by said Henry L. Bacho and wife; was dated the 20th October, 1863; conveyed to said Frederic Scheible a lot in the city of Mobile, with a brick store thereon erected, and was sub-

ject to the following condition: "Provided always, and these presents are upon this express condition, that if the said Henry L. Bacho shall well and truly pay to the said Frederic Scheible, or his heirs, the sum of four thousand dollars, according to his certain promissory note, bearing even date with these presents, negotiable and payable at the Bank of Mobile, on the first day of November, 1864, without default, then these presents shall cease," &c. The bill alleged, that the note and mortgage were given to secure the payment of four thousand dollars, loaned by the said Scheible to said Bacho on the 20th October, 1863, in Confederate States treasury-notes of the old issue; that the money was borrowed by Bacho, at the solicitation of Scheible, "and with the understanding that it should be returned in twelve months, and that the complainant should pay to the said Scheible, for the use thereof, one barrel of lard, the value of which exceeded the lawful interest on the money so borrowed;" that the complainant delivered the barrel of lard, and also executed and delivered the note and mortgage, according to the stipulations of the contract; that the value of such treasury-notes, at that time, "was about twelve for one in gold or silver;" "that it was understood, at the time said money was borrowed, that payment was to be made in like currency, and defendant did not in any manner intimate that any other would be required;" that the complainant tendered to said Scheible, at the maturity of said note, in Confederate States treasury-notes of the new issue, the full amount due on the note; that this tender was made by complainant, first in person, and afterwards through an agent, and was rejected by the defendant, "who refused to receive Confederate money on any terms;" that the complainant retained the money so tendered, and kept it on hand ready to deliver at any time to the defendant, and held it "ready to pay into court, and subject at any time to the order of the court." The complainant insisted—"1st, that said note and mortgage are voidable in this honorable court, on the ground that *it* was obtained by fraud and misrepresentation; 2d, that the consideration was illegal and unconstitutional, and, for this reason, the

court ought not to allow their enforcement at law ; and, 3d, that even if said note and mortgage be in other respects good, yet the tender destroyed their legal effect;" and he therefore prayed relief as above stated.

The defendant answered the bill, admitting the loan of the four thousand dollars in Confederate States treasury-notes, and the execution of the note and mortgage to secure the payment of the money; but denying the averments of the bill as to the terms of the contract between the parties. He alleged, that the complainant asked the loan of the money, to enable him to buy the house and lot conveyed by the mortgage, which at that time belonged to one Hallett, and was occupied by the complainant as the tenant of said Hallett, and offered to have it conveyed to him, or to give him a mortgage on it; that he agreed to lend the money to complainant for that purpose, "without charging him any interest, provided said Bacho would agree to pay said sum of money, in current funds, six months after the war was over;" that Bacho "distinctly agreed to this proposition, and respondent accordingly delivered the money to him, and took no note or receipt for the same, but told him to go and purchase the house and lot, and then to make a note and mortgage to respondent;" that this interview took place on the 19th October, 1863; that the complainant purchased the house and lot on the same day, at the price of five thousand dollars in Confederate money, and used the money borrowed from respondent in making payment for it; that the value of the house and lot at that time, as respondent informed complainant after examining the premises, was five thousand dollars in gold or silver; that complainant and respondent went together, on the next day, to an attorney's office, for the purpose of having the note and mortgage executed; that the complainant "told the attorney what was wanted, and respondent returned to his business;" that the note and mortgage were delivered to him on the evening of the same day, and he supposed they were drawn according to the terms of the contract, but he did not read them, "being unable to write the English language, or to read it understandingly." He admitted the tender, as alleged, and his refusal thereof; and insisted

that, by the terms of his contract with complainant, he was not bound to accept such tender. He admitted that the complainant had delivered to him a barrel of lard, but alleged that it was given and accepted as a present, and not by way of interest on the money loaned.

The complainant offered in evidence, on the hearing, the depositions of George Conway, T. P. Miller, and Br. Tardy; and the defendant offered in evidence the depositions of Caleb Price, Willis Pope, Moses Waring, and Julia Scheible, "and the mortgage and note exhibited with bill;" but the note was not made an exhibit to the bill, nor is a copy of it any where found in the record. Conway was the attorney who drew the note and mortgage, and who made the tender for the complainant; and he testified to these facts in answer to the interrogatories propounded by the complainant. He stated, also, in answer to the cross interrogatories on the part of the defendant, that when the parties came to him, to have the note and mortgage drawn, they stated that the money had been loaned to the complainant to enable him to purchase the house and lot, and had been used by him for that purpose; that he asked some question about the interest, and was told by them that no interest was charged; that the complainant afterwards told him, that he had made the defendant a present of a half-barrel of lard; that the property was worth, in his opinion, in January, 1861, and at present, five thousand dollars in gold; that in 1863, "the currency having become much depreciated," ten thousand dollars was a reasonable price for it; that it would have rented for twelve hundred dollars, from November, 1863, to November, 1864, and for fifteen hundred dollars for the year ending November, 1866. Miller testified, that the value of Confederate treasury-notes, as compared with gold, on the 19th October, 1863, was about eleven for one. Tardy testified, that on the 19th October, 1863, the property was worth five thousand dollars in Confederate treasury-notes. Price testified, that the property was worth, in the present currency, five thousand dollars; and Waring, that it was never worth less than that sum in gold, and that the annual rent was worth, in 1865–6, one thousand dollars.

On final hearing, on pleadings and proof, the chancellor held, that the complainant was entitled to relief; and he therefore ordered a reference to the master, to ascertain—".1st, what was the value in gold, on the 20th day of October, 1863, of the Confederate treasury-notes loaned by the defendant to the complainant, and what amount is now due thereon, including interest on said value from the 4th day of November, 1864; and, 2d, what is the value of the sum so found to be due in gold, in the present currency of the country, at this time." The master reported, that the value in gold, of the money loaned in Confederate treasury-notes, with interest thereon from the 4th November, 1864, was four hundred and twenty-nine 16-100 dollars; which sum, reduced to its value in United States treasury-notes at the time the report was made, (February 6, 1867,) amounted to five hundred and seventy-nine 36-100 dollars. The report was confirmed, without objection by either party, on the 8th February, 1867; and the complainant having paid into court the sum so reported by the master to be due, the chancellor rendered a final decree, perpetuating the injunction of the action at law, declaring the mortgage satisfied, directing an entry of satisfaction to be made by the defendant on the records of the probate court in which it was registered, ordering the money in court to be paid to the defendant, and dividing the costs equally between the parties.

The appeal is sued out by the defendant, and the decree of the chancellor is assigned as error.

W. BOYLES, for the appellant.—1. This court has decided, in the recent case of *Watson and Wife v. Stone*, (40 Ala. ——,) that the late Confederate States, during its existence, was a government *de facto*. The logical consequence of this principle is, that contracts made within the limits of the Confederate States during the war, if not contrary to its laws and policy, were valid and binding beteween the parties.

2. The third section of the ordinance of the State convention, adopted on the 28th September, 1865, if it be applicable to any chancery suit, should not be applied to a

Scheible v. Bacho.

case like this. The framers of that ordinance could not have intended, by said section, to clothe the chancery court with power to cancel and set aside a mortgage to land, where there is no pretense of any fraud, accident, or mistake. Such a construction of the ordinance would make it impair the obligation of contracts, and destroy vested rights. A mortgage is a purchase *pro tanto.*—47 Maine, 514. If the ordinance be applicable to a mortgage, or conditional, or partial sale, it must equally apply to an absolute sale; if to an executory, then also to an executed contract. The constitutional provision, in guarding the inviolability of contracts, recognizes no distinction in their nature.— 6 Cranch, 135; 7 Cranch, 164. Any law, which enlarges, abridges, or changes the intention of the parties, resulting from the stipulations of the contract, impairs its obligation. 12 Wheaton, 256, 327; 3 Wash. C. C. 319; 8 Wheaton, 84; 4 Wheaton, 197; 24 Howard, 461; 40 Penn. St. 324; 32 Barbour, 358.

3. If the ordinance be applicable to such cases, there is no evidence in the record to bring this case within its terms. There is no proof of any express agreement to receive Confederate treasury-notes in payment of the debt; and the facts of the case negative the existence of any implied understanding to receive them.

4. If the case be held to fall within the terms of the ordinance, then the question arises, what amount is the defendant "legally, justly, and equitably entitled to receive, according to the contract," under the pleadings and proof. It is submitted, that this provision of the ordinance was designed and intended to give the courts and juries of the country the power to do substantial (or natural) justice between the parties, without reference to the technical rules of law; and that "the real and true value of the consideration of the contract," by principles of equity and natural justice, is not the value of the treasury-notes in gold, but the value of the property which was bought with it, and to buy which it was expressly loaned. The property was worth five thousand dollars in gold when it was bought by Bacho, and it is worth that amount to-day; and four-fifths of the purchase-money was advanced by the defend-

ant. The money was loaned for the specific purpose of making the purchase, and under an agreement, as a condition precedent, that the property should be conveyed to the defendant to secure the re-payment of the money; and the property was purchased and conveyed accordingly. A court of equity will not compel a divestiture of the legal title, without requiring the complainant, as a condition of relief, to pay the amount due in equity and good conscience. *Pearson v. Bailey*, 23 Ala. 537 ; 6 Cowen, 139 ; 8 Gill & J. 170 ; 10 Ohio, 501. If the complainant had bought the property on a credit, and given Hallett a mortgage to secure the payment of the purchase-money, and Hallett had sued to recover the possession ; would not the complainant be compelled, as a condition precedent to relief, to pay the true value of the property ? The defendant, under the facts of the case, should be subrogated to the rights which Hallett would have had in the case supposed. 35 Penn. 111 ; 6 Watts, 221 ; 4 H. & M. 436 ; 3 Paige, 117 ; 6 Watts & Serg. 190 ; 38 Penn. 512.

DARGAN & TAYLOR, *contra.*—1. The transaction between the parties, as disclosed by the pleadings and proof, was a mere loan of money, with a mortgage to secure its payment. The debt was payable, as shown by the note and mortgage, at the expiration of twelve months, and not, as the defendant alleged in his answer, six months after the close of the war. The chancellor allowed the defendant the value of the money which he loaned, with legal interest thereon; and this is all he could claim in a court of equity.

2. The doctrine of subrogation has no application to the case. Hallett had no rights or equities, to which Scheible could be subrogated.—*Foster v. Atheneum*, 3 Ala. 310. The fact that Bacho made a good bargain with the money loaned to him, certainly gives Scheible no claim to share in the profits ; as well might Bacho insist, if his bargain had proved a bad one, or his house had been burned down, that Scheible should share the loss.

3. The reduction of the debt was authorized by the ordinance of the 28th September, 1865, which applies equally to all debts, the consideration of which was Confederate

Scheible v. Bacho.

money, whatever the nature of the contract, or the form of the suit in which it is involved. The ordinance does not require proof of an express agreement to receive Confederate money in payment of the debt: an implied understanding, as shown by the nature of the contract and conduct of the parties, is sufficient. A loan in currency so greatly depreciated, if nothing were said as to the character of the funds with which payment should be made, must be presumed to have been made in contemplation of payment in the same or similar currency. There is no proof whatever that the parties intended a payment in gold, or in United States currency: on the contrary, such intention is repelled by their conduct, and by the character of the transaction itself. Nothing was said by either party, as to a payment in gold or United States currency, when they employed the attorney to write the note and mortgage; and when the defendant rejected the tender of the Confederate treasury-notes, he placed his refusal on the ground that he must first see another person who was interested with him. The value of the property was estimated by Tardy to be five thousand dollars in Confederate treasury-notes; and the fact that Hallett sold it for that sum, is proof of its market value at the time. To borrow four thousand dollars in depreciated currency, (worth less than four hundred in gold,) with which to purchase property worth five thousand in currency, and to promise to pay the loan in gold, would be the contract of an idiot—would be usurious, unconscionable, and inequitable; and no court would lend its aid to enforce such a contract. If the property had been worth five thousand dollars in gold, the entire profits of the purchase would have enured to the lender. Why borrow from Scheible at such usurious rates, when, as the witnesses testify, the money could have been borrowed easily on the property itself?

4. The ordinance of September 28, 1865, in its application to this case, simply changes a rule of evidence, and does not impair the obligation of contracts. If the constitution of the United States is invoked to defeat the operation of the ordinance, then it is contended, that the note

itself is void, under that constitution, for illegality of consideration.

A. J. WALKER, C. J.—The complainant filed his bill in this case, praying alternative reliefs. The reliefs alternatively prayed were—that a mortgage on land, given by him, should be set aside, upon the ground that it was void, because it was predicated upon the loan of Confederate treasury-notes ; or that he should be permitted to redeem, upon payment of the value of the Confederate treasury-notes, the loan of which was secured by the mortgage, or upon the payment of such sum as the court may direct. The chancellor granted a redemption, upon payment of the value of the Confederate treasury-notes ; and the defendant appealed. One of the members of this court attains the conclusion, that the decree of the court below should be affirmed ; because the mortgage, being predicated upon the loan of Confederate treasury-notes, is void, and the decree is therefore too favorable to the appellant. The majority of the court are of the opinion, that the decree should be reversed.

We will first consider the point upon which our brother attains his conclusion. We hold, that the mortgage is not void. We maintain, that executory contracts, made during the late war, in the State of Alabama, are valid, and enforcible in the courts of this State, notwithstanding they may have been predicated upon a loan of Confederate treasury-notes. This proposition, we think, is sustained, when it is established that the Confederate States, and the State of Alabama, were *de-facto* governments. We discussed this question in *Watson v. Stone*, (40 Ala. ——,) and held, that they were *de-facto* governments. Since that time, Chief-Justice Chase, of the supreme court of the United States, sitting as a circuit judge in North Carolina, in the case of *Shortridge v. Macon*, expressed the contrary opinion. If the supreme court of the United States had so held, we would promptly yield to its authority, and reverse our ruling on this subject; but we have the opinion of only one of the judges of that court, and we think the evidences

Scheible v. Bacho.

justify the conclusion, that the action of the court will be different.

The decisions of the supreme court of the United States in the *Prize Cases*, (2 Black, 666-7-8,) *The Venice*, (2 Wallace, 258,) *Mrs. Alexander's Cotton*, (*ib.* 404,) *The Peterhoff*, (5 Wallace, 28-60,) seem to justify the conclusion, that that tribunal will decide, that the governments of the Confederate States, and of the State of Alabama, were *de-facto* governments. The power and dominion of those governments, within certain geographical boundaries, were fully established, and for a long time maintained. They gave laws to the people, and enforced them in regular courts. The United States government declared all the people within those boundaries enemies, and refused to them, without regard to their political opinions, redress in its courts; and prohibited all commercial intercourse between the people within the loyal States, and those within the hostile section. It is difficult to conceive how, under these circumstances, the supreme court of the United States can hold that there was not an actual government in fact.

These governments were those in whom *stet rei agendi potestas;* and therefore, according to publicists of highest repute, were capable of recognition in diplomatic relations. 1 Kent's Com., m. pp. 40, 167. In the case of *Folliott v. Ogden*, (1 H. Blacks. 123,) Lord Loughborough decided, that New York was, in 1779, a State capable of declaring a forfeiture of goods, notwithstanding the treaty of peace was not made with Great Britain until 1783. Lord Kenyon, on writ of error in the same case, expressed the contrary opinion.—3 Term R. 401. The supreme court of the United States, in the case of *Ware v. Hilton*, (3 Dallas, 199,) compared the antagonistic opinions of Lord Loughborough and Lord Kenyon, and approved the former.

In the case of *Ware v. Hilton, (supra,)* Judge Chase, delivering the decision of the supreme court, inquired, at what time the colonies became a separate government, and at what time the war between Great Britain and her colonies became a public war; and held that the governments of the latter became separate and distinct when the war became public. The confiscation, in 1777, of a debt due by a citi-

zen of Virginia to a British subject, under a Virginia stat-
ute, was in this case sustained.

When the attitude and condition of New York and Vir-
ginia in 1777 and 1779 is contrasted, in the light of history,
with that of the States within the area under the control of
the Confederate States, there is an obvious want of reason
for attributing to the former the character of a government,
and denying it to the latter. The former were successful
in their contest with the parent country ; and the latter was
unsuccessful. This difference may affect the question,
whether there was a *de-jure* government in the eye of
the law ; but it can not affect the question of a *de-facto*
government, for that depends, not upon right, but upon
fact, regardless of right. With this distinction, per-
haps, in his mind, Judge Chase, in *Ware v. Hilton, (supra,)*
affirmed that, "from the 4th July, 1776, the American States
were *de facto,* as well as *de jure,* in the possession and ac-
tual exercise of all the rights of independent governments."

The supreme court of the United States, in the case
above noticed, refers to Vattel, as an authority on the *status*
of the parties to a civil war in its various stages. That au-
thor, in his work on the Law of Nations, (pp. 424–7,) says :
" When a party is formed in a state, who no longer obey
the sovereign, and are possessed of sufficient strength to
oppose him ; or when, in a republic, the nation is divided
into two opposite factions, and both sides take up arms—
this is called a civil war. *    *    *    *    A civil war breaks
the bonds of society and government, or, at least, suspends
their force and effect ; it produces in the nation two inde-
pendent parties, who consider each other as enemies, and
acknowledge no common judge. These two parties, there-
fore, must necessarily be considered as thenceforward *con-
stituting, at least for a time,* two separate bodies—two *dis-
tinct societies.* Though one of the parties may have been
to blame in breaking the unity of the state, and resisting
the lawful authority, they are not the less divided in fact.
*    *    *    *    But, when a nation becomes divided into two
parties absolutely independent, and no longer acknowledg-
ing a common superior, the state is dissolved, and the war
between the two parties stands on the same ground, in

Scheible v. Bacho.

every respect, as a public war between two different nations. Whether a republic be split into two factions, each maintaining that it alone constitutes the body of the state, or a kingdom be divided between two competitors for the crown—the nation is severed into two parties, who will mutually term each other rebels."

Let this description of a party to a civil war, become in fact a separate nation, be contrasted with the description in 1862 of the Confederate States by the supreme court of the United States in the *Prize Cases*, and it seems inevitable, either that the authority of Vattel must be overthrown, or that court must pronounce the Confederate States a government in fact. The court says: "In organizing this rebellion, they have acted as States, claiming to be sovereign over all persons and property within their respective limits, and asserting a right to absolve their citizens from their allegiance to the Federal government. Several of these States have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. The *right* to do so is now being decided by wager of battle. The ports and territory of each of these States are held in hostility to the general government. It is no loose, unorganized insurrection. It has a boundary, marked by lines of bayonets, and which can be crossed only by force. South of this line is enemies' territory, *because it is claimed and held in possession by an organized, hostile, and belligerent power*."

The court of appeals of Kentucky, in *Hildreth v. McIntyre*, (1 J. J. Marshall, 206,) discussing the question of *de-facto* officers and *de-facto* governments, used the following language: "When the government is entirely revolutionized, and all its departments usurped by force, or the voice of a majority, then prudence recommends, and necessity enforces, obedience to the authority of those who may act as the public functionaries; and in such cases, the acts of a *de-facto* executive, a *de-facto* judiciary, and a *de-facto* legislature, must be recognized as valid. But this is required by political necessity."

In 1818, a question arose in the State of Mississippi, as to the law which prevailed there before the organization of

the territorial government in 1799. The supreme court decided, that the [law of Spain prevailed, and controlled the question involved; remarking, that "Spain, until the fall of 1798, exercised jurisdiction over this country. Whether this jurisdiction was rightful, is not the subject of inquiry— it is sufficient if it was a government *de facto*."—*Chew v. Calvert*, Walker's R. 54.

In 1866, the supreme court of Arkansas, after a careful examination of the subject, held that there was in Arkansas, during the late civil war, a *de-facto* government.—*Hawkins v. Filkins*, 24 Ark. 286.

This question of a *de-facto* government we discussed with care in the case of *Watson v. Stone*, (40 Ala. ——,) and to the opinion in that case we refer for arguments and authorities, which it would be mere idle repetition to reproduce here. We feel a thorough conviction, that the proposition, asserting the existence of governments at least *de facto*, is maintained by unanswerable argument and authority, and that it will be approved by the supreme court of the United States.

[2.] From this proposition it is a corollary, that the contracts made within the territorial jurisdiction of those *de-facto* governments are to be tested and construed according to their laws, and not by the constitution and laws of the United States; as to which government they stood, for the time being, as separate and distinct organizations. The Confederate States, and the State of Alabama, having been at the time when this contract was made *de-facto* governments, its validity in its creation is to be tested by the laws of such governments. It stands as a contract made in a foreign government. The legality of its making is governed by the *lex loci contractus*. In the issue, circulation, and use of the Confederate treasury-notes, there was a perfect consistency and harmony with the laws of those governments. There was, therefore, no illegality in the contract at the time and place of its making.

[3.] It is contended, that even with the concession of the above stated propositions, the executory contract must be treated as void, in courts acting under the authority and constitution of the United States. It is certainly correct,

Scheible v. Bacho.

that contracts made in foreign countries are executed on a principle of comity; and that the doctrine, that contracts, valid by the laws of the country where made, will be enforced in any other country, is subject to several exceptions. One of those exceptions is, that a contract will not be enforced, when it is opposed to the national policy, or national institutions.—Story on Conflict of Laws, § 244. It may be conceded, that, under this rule, the issue of Confederate treasury-notes was in contravention of the policy of the United States, because of its immediate effect in maintaining a contest for the dismemberment of the nation. It may also be conceded, that the making of contracts upon the basis of that currency had a *remote* tendency in the same direction. But contracts are not treated as void, because they have such *remote* tendency. The issue of the Confederate States currency had the effect of contributing means to prosecute the war against the United States. The passage of that currency in the making of contracts may have contributed indirectly to the preservation of its value. This indirect, remote effect does not vitiate the contracts based upon such currency. We propose, first, to sustain this proposition by an examination of the authorities, especially of the decisions of the supreme court of the United States.

*Armstrong v. Toller*, (11 Wheaton, 258,) was a case, where there was an illegal and fraudulent importation of goods. The consignee, who knew the character of the importation, became surety for the payment of the duties, and responsible for the expenses of defending a prosecution for the illegal importation. Being compelled to make payment on account of his suretyship and responsibility, he successfully maintained a suit for reimbursement. The objection was made, that the transaction was tainted by the illegality of the illegal importation; but it was upheld, upon the ground that it was upon a new consideration, and did not grow *immediately* out of the illegal act.

In the case of *Randon v. Toby*, (11 Howard, 493,) it was decided by the supreme court of the United States, that a note given in Texas, for the purchase of negroes illegally imported from Africa some years before, and sold into

slavery, was valid. The court, *arguendo*, said: "If the defendant should be sued for his tailor's bill, and come into court with the clothes made for him on his back, and plead that he was not bound to pay for them, because the importer had smuggled the cloth, he would present a case of equal merits."

In *McBlair v. Gibbes*, (17 Howard, 232,) there was an association for fitting out a military expedition, in violation of the neutrality laws of the United States, which was illegal. An assignment of one of the shares was held by the supreme court of the United States, after the fullest consideration and examination of authorities, to be valid.

In *Orchard v. Hughes*, (1 Wallace, 73,) a mortgage was foreclosed, which secured a debt based on the notes of a bank chartered illegally, and for fraudulent purposes; and which notes, though of value at the time, finally proved worthless in fact.

In the case of *Brooks v. Martin*, (2 Wallace, 70,) there was a partnership for the transaction of business illegal and contrary to public policy. One of the partners, having made a fraudulent purchase of another's interest, was compelled to account for everything received, notwithstanding the illegality of the partnership business was pleaded.

In our own court, in the case of *Branch Bank at Montgomery v. Crocheron*, (5 Ala. 250,) a question strikingly illustrative of the point in this case arose. Bills were issued by the Montgomery and West-Point Railroad Company, engraved and fitted for circulation as money. These bills were passed to the Branch Bank at Montgomery, with the understanding that they were to be loaned to a corporation. They were so loaned, and the action was brought upon the security given for the loan. The issue of these notes by the Montgomery and West-Point Railroad Company was held by this court to be illegal. It was further held, that they would be invalid in the hands of the bank which participated in the illegal purpose, or in the hands of any person participating in the illegal intention, to whom they might come. But the court decided, that beyond this the law would not go, and that the sanctity of the law was sufficiently vindicated by declaring the paper

void in the hands of one *immediately* connected with the illegal transaction. It was held, that the security given for the loan of those bills was recoverable.—See, also, *McGehee v. Powell*, 8 Ala. 827.

Authorities of like character crowd upon our attention from many quarters, but we forbear to notice them. Enough have been adduced to exemplify and establish the principle proposed to be maintained. That principle is, that although an act illegal, or contravening public policy, has been done, those acts which follow it, and grow remotely out of it, being independent transactions, done without complicity in the original illegal purpose, will be sustained, notwithstanding they have incidentally had the effect of contributing remotely to the furtherance of the original illegal design. And the cases show that it makes no difference, that the new contract is made with a knowledge on the part of the parties thereto of the illegality of the original transaction. For example : the smuggling of goods is indirectly encouraged by the subsequent sales of them ; yet such sales are valid. The issue of paper to circulate as money, by a corporation, in violation of law, being illegal, is encouraged by the subsequent use of the money by innocent parties as the basis of contracts ; yet such contracts are valid. The importation of Africans is encouraged by the subsequent sales of them by and to innocent parties ; yet contracts for payment for such sales are valid. A bank fraudulently and illegally issues bank paper ; yet a mortgage for the security of the loan of such paper, when of value, is foreclosed, notwithstanding the loan and mortgage contribute indirectly to the accomplishment of the original illegal and fraudulent purpose of giving currency to the paper. A like remark might be made in reference to each one of the authorities cited above.

Judge Story, in his work on the Conflict of Laws, (§ § 248–253,) clearly asserts the doctrine we are maintaining. He thus states the principle, which underlies the cases we have cited: " But the principle stops here, and is not extended to new and independent transactions after the illegal act. If the new contract is wholly unconnected with the illegal act, and is founded on a new consideration, and is

not part of the original scheme, it is not tainted by the illegal act, although it may be known to the party with whom the contract is made. Thus, if after the illegal act is accomplished, a new contract (not being unlawful in itself) is made by the importer, for a sale of the goods to a retail merchant, and the merchant afterwards sells the same to a tailor, or to a customer, who had no participation whatsoever in the original scheme, such new contract will be valid, although the illegality of the original importation is known to each of the vendees at the time when he entered into the contract."

The obvious application of the principle deduced from these authorities is this : that although the establishment of the Confederate government may have been illegal, and the issue of treasury-notes for the support of that government and its war may have contravened the policy, and opposed the interests of the United States; and although the use of such treasury-notes, as the basis of contracts, may have incidentally contributed some remote influence in furthering the original illegal design, by assisting to give them value and circulation ; yet such contracts are not therefore void. In the event of a war between the United States and Great Britain, if the latter government should enter into a contract with the Bank of England, that it should largely increase its circulation for the purpose of making a loan to the British government, so as to enable it to wage efficient war on the United States, that contract would not be enforced in the courts of this country; but none would contend, that a contract between private citizens, for the loan of the money when put in circulation, would be declared void by our courts; yet that is a case strictly analogous to the one in hand. If the Confederate States goverment, during its existence, had made a contract with a private person to carry cotton abroad, and exchange it for gold, and bring the gold thus procured to that government, in order that it might be used in the prosecution of the war against the United States ; such contract would be repudiated by the courts of the United States. But, if the Confederate States had used the gold, after receiving it, in such form or packages as to be susceptible of identifi-

cation, who would contend that contracts between private citizens, made upon the basis thereof, would be void? Yet it is difficult to conceive of an objection made to the contract in this case, which might not be made in that.

A very strong case, involving the point of controversy which we are handling, arose and was decided in the supreme court of North Carolina, at its June term, 1867. The case is *Philips v. Hooker*, and will be found on page 194 of the North Carolina Reports of that term. In that case, there was a bill for the specific performance of a contract for the sale of land, made in 1862. The defense was put upon the ground, that the consideration of the contract was the payment of Confederate treasury-notes. The three learned and able judges of the court delivered their opinions *seriatim*, and each concurred in maintaining the validity of the contract, and the legality of a decree for specific performance. We quote at length from the opinion of Chief-Justice Pearson, as follows : " It is said, that every dealing in Confederate treasury-notes gave them credit and circulation, and consequently aided the rebellion ; so every such dealing was illegal, and not fit to be enforced by the courts, without reference to the intent of the parties. The proposition is general—every man and woman, who, in the ordinary course of business, received a Confederate note, did an illegal act tainted with treason. It embraces all contracts, as well contracts executed as executory ; for, if true as to one, it is also true as to the other ; and it aims a blow at all dealings among our people during the war, and upheaves the foundations of society. I do not believe the proposition can be maintained by any authority, or any principle of law. It may be conceded, that if, at the outbreak of an insurrection, parties to contracts, *with a view of aiding the cause,* by giving credit and circulation to its paper, receive it as money in their dealing, such contracts are illegal. But that is not the case under consideration. In 1862, the contest had assumed the magnitude and proportions of war ; each party, in territorial limits, had the boundaries of a mighty nation, and each party counted its people by millions. The Confederate States

was recognized by the nations, and by the United States itself, as a belligerent power, entitled to the rights of war; and in the exercise of its powers, it had issued paper, as the representative of money, which excluded all other currency, and constituted the only circulating medium of the country. The government of the United States was unable to protect the people, and there was no currency but Confederate treasury-notes. In this condition of things, was every man to stop his ordinary avocations, and starve, or else be tainted with treason, and deemed guilty of an illegal act, if he received a Confederate treasury-note? * * * * * * * * * * Was a judge to cease to do those duties required by the interests of humanity, the performance of which can never be considered as criminal; or was he to perform the duties, and starve, rather than commit an illegal act by receiving his salary in Confederate treasury-notes? Was the merchant to close his store, the blacksmith and shoemaker to quit work, and the farmer to let his tobacco and surplus grain rot on his hands, and allow his family to suffer for clothing, and the other necessaries of life, or do an illegal act by receiving Confederate notes? Really, unless the receiving of such notes can be connected with a criminal intent to aid the rebellion, the question seems to me too plain to admit of argument. A naked statement exposes the absurdity of the proposition. The courts must act on the presumption, that Confederate notes were received in ordinary dealing—not for the purpose of aiding the rebellion, but because there was no other currency. * * * * * * It cannot be held that the mere receiving a Confederate note was illegal and base, without involving in the imputation of baseness every man and woman in the State. The minister of the gospel, the judge who received his salary, the physician, the merchant, the mechanic, the farmer, who carried on his ordinary business, the poor seamstress, who at the end of the day received her hard-earned wages—were all guilty of an act so base, that the doors of the courts of justice must be shut against them! The proposition is monstrous!"

This long extract is so sensible and so valuable as to justify its production. It may be said, that the use of Con-

federate treasury-notes, however innocent it may have been, was, *per se*, violative of the policy of the United States. We have quoted so extensively from the opinion of Chief-Justice Pearson, on account of its forcible exposition of the absurdity of this proposition. The use of such notes was a necessity, unavoidable, and universal. Every social, moral, and religious interest depended upon the yielding to this necessity. Humanity itself demanded the same thing. To attribute to the United States a policy and intent opposed to the use of such currency, would visit upon it the stigma of antagonism to humanity and every interest of society in all its gradations. Obedience to a *de-facto* government is tolerated in the law, upon the sensible theory, that the rightful government would prefer such obedience to the prevalence of lawlessness and social chaos.— *Watson v. Stone*, (40 Ala.) and authorities cited. Surely, for a like reason, a humane government would prefer a submission to the use of the currency prescribed by the government actually dominant, to the dreadful consequences which would result from the opposite course ; consequences which even human nature could not endure. Humanity and civilization would be shocked by the fixing of a stigma upon obedience to a necessity, which bound and fettered the will by an inexorable power. Obedience to this necessity was rendered cheerfully or reluctantly, according as the cause of the Confederate government was or was not favored; but, in every case, such obedience was unavoidable.

4. The scaling the mortgagee's debt, to the value of Confederate treasury-notes, it is contended, is authorized by the ordinance adopted the 28th September, 1865.—Revised Code, p. 59. The third section of that ordinance is in the following words : " In all suits upon contracts made between the first of September, eighteen hundred and sixty-one, and the first of May, eighteen hundred and sixty-five, parol evidence shall be admissible to prove what was the consideration thereof, and whether or not the parties thereto understood or agreed that the same should be discharged by a payment in Confederate currency or treasury-notes; and if so, or if it appears so from the contract, then to show what was the real or true value of the consideration

of said contract, and what amount the plaintiff is legally, justly, and equitably entitled to receive, according to the contract, by the judgment of the said court."

This ordinance should receive a liberal construction, in furtherance of the purpose of justice, which its framers contemplated. So construing it, and, in a slight particular, postponing the·letter to the intent, we hold that it applies to a suit in equity for a redemption, and that under it there may be an ascertainment, upon the plan prescribed, of the amount due the mortgagee, although not technically a " *plaintiff*."

5. A careful reading of the above copied section of the ordinance will convince any lawyer, that a reduction of the debt is not authorized merely because the consideration was Confederate money; but that it is necessary that there should have been an understanding or agreement that the debt should de discharged in Confederate currency or treasury-notes. Thus understood, the ordinance does not impair the obligation of contracts; but it simply removes a rule of evidence, which the cautious policy of the law interposed to prevent the ascertainment of the contract, in so far as it existed in parol.— *Woodfin v. Slunder*, Phil. N. C. Law Reports, at January term, 1867, p. 200.

The complainant in this case has promised to pay so many dollars. This purports, upon its face, to be a contract for the payment of constitutional money. To modify this contract into a promise to pay Confederate money, it is requisite that an agreement or understanding, either express or implied, should be shown for the payment in such money, either by positive testimony, or by circumstances. Has the complainant shown that fact? The bill alleges, that the complainant was to return Confederate money, and that the interest for the year, at the expiration of which the debt would be due, was to be paid in a chattel, which the complainant alleges he delivered. The oath of the defendant to the answer was not waived, and the answer is made on oath. The defendant, in his answer, in strict response to the allegation of the bill, denies that the payment was to be made·in Confederate money, and asserts the contrary. He also denies that the interest was paid in

Scheible v. Bacho.

the chattel, and asserts that the chattel was a present, and that the postponement of payment without interest was because of the loan in Confederate money, and because there was an understanding that the payment was to be made, six months after the close of the then pending war, in current money. The complainant cannot have the benefit of the alleged fact, thus denied, unless he has overcome the answer by the testimony of two witnesses, or of one with corroborating circumstances. The only proof controverting the denial of the answer is the great depreciation of Confederate money at the time—eleven or twelve dollars of it being worth no more than one dollar in gold. The force of this testimony, and the strong deductions which may be drawn from it, cannot be denied; and we do not intend to decide what effect such testimony, standing alone, should have. On the other hand, however, the defendant explains by his testimony that the complainant borrowed the money to enable him to consummate the purchase of a house and lot; and the testimony conduces very strongly to show that the price at which the purchase was made did not exceed its value in specie. This testimony, thus showing that the complainant could and did make the Confederate money borrowed available to the value of specie, very greatly lessens the improbability and unreasonableness of his giving a note payable in constitutional currency, for the loan of Confederate money. With this view of the testimony, it cannot be concluded that the positive denial of the answer is overcome by the equivalent of the testimony of two witnesses, or of one with corroborating circumstances. The complainant therefore fails to establish the agreement or understanding, that the note should be paid in Confederate money; and he was, therefore, not entitled to a reduction of the note.

There are other points made by the counsel on both sides; but there are none of them affecting the conclusion attained by us, which we consider sound, or which we deem it important to notice. We think the allegations of the bill are sufficient to authorize a redemption by the complainant, upon the payment of the debt of four thousand dollars, with interest from its maturity, and also for a per-

petual injunction of the action at law upon the consummation of the redemption. That proceedings may be had in the court below conformable to this opinion, the cause is remanded.

Reversed and remanded.

BYRD, J.—Appellee, in 1863, borrowed of appellant four thousand dollars in Confederate treasury-notes, and executed a promissory note, and a mortgage upon a house and lot in the city of Mobile, to secure the payment of the debt thus contracted. Appellant, after the law-day of the mortgage, brought a suit to recover the house and lot therein conveyed; and appellee, thereupon, by a bill in equity, sought to enjoin the suit, and a cancellation of the note and mortgage, on the ground that the consideration of the note and mortgage is illegal; or, if the court should consider him bound on the note and mortgage, then to redeem the premises conveyed, upon the payment of such sum as may be due; and in this event he insisted, that he ought not to be required to pay more than the value of the notes borrowed at the date of the transaction. The court made a decree in conformity to the alternative prayer of the bill, allowing *appellant* the value of the notes borrowed, with interest thereon. This presents the leading features of the case.

The question, whether the loan of the treasury-notes issued by the *late* Confederate States, to circulate as money, is a legal consideration, is one of no inconsiderable magnitude and perplexity. I have heretofore dissented from opinions of the court, delivered upon questions having their origin in the transactions which took place in the State during the late civil war, and especially as to the validity of the legislation and of such transactions, founded on Confederate States bonds and notes, without expressing, in writing, the grounds of dissent; but reserving the right to do so on some future occasion. I see proper to present my views on these topics, in this case, as it involves a question as general in its bearings as any which has come before us for adjudication.

I deem it appropriate and expedient, in the investigation

and exposition of the general subject under consideration, to make a concise and comprehensive analysis of the elements or primary principles of the peculiar (if not anomalous) form and structure of our State and national governments.

The American Colonies, in 1776, prior to the declaration of independence, were under separate, and, as to each other, independent colonial governments; yet, all under the united power and control of the empire of Great Britain. That declaration uses the language, "that these *united* colonies are, and of right ought to be, free and independent States." The articles of confederation of 1777 declare, that "each State retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is not by this confederation expressly delegated to the United States in congress assembled;" and in article XIII, "that the articles shall be inviolably observed by the States, * * * and that *the union shall be perpetual.*"

The framers of the constitution of 1787 clearly recognized the sovereignty of the States; and that ;under the constitution the United States government would be clothed with sovereignty. Mr. Mason, of Virginia, speaking in convention of its effect upon the State and general governments, said: "The United States will have a qualified sovereignty only. The individual States will retain a part of the sovereignty."—Madison Papers, p. 1373. Mr. Ellsworth said, that "the United States are sovereign on one side of the line, dividing the jurisdiction; the States on the other." The correctness of these views was never questioned in the convention.

While the adoption of the constitution by the States was pending, Alexander Hamilton, who was a firm and avowed advocate of a strong national government, wrote as follows: "The proposed constitution, so far from implying an abolition of the State governments, makes them constituent parts of the national sovereignty, by allowing them a direct representation in the senate, and leaves in their possession certain exclusive and very important portions of *the sovereign power.*"—Federalist, (ed. of 1831,) p. 44. On page 151 he says: "But, as the plan of the convention aims only

at a partial union, or consolidation, the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States." On page 192, Mr. Madison says : " In this relation, the proposed government cannot be deemed a *national* one ; and leaves to the several States a residuary and *inviolable* sovereignty over all other objects." Mr. Adams, in his inaugural address of the 4th of March, 1825, said : " That the general government of the Union, and the separate governments of the States, are all sovereignties of legitimated powers ; fellow-servants of the same masters, uncontrolled within their respective spheres, uncontrollable by encroachments upon each other." President Jackson, in his proclamation of the 10th of December, 1832, said : " The States severally have not retained their entire sovereignty. It has been shown that, in becoming parts of a nation, not members of a league, they surrendered many of their essential parts of sovereignty ;" and in his farewell address, he says : " Every friend of our free institutions should be always prepared to maintain unimpaired, and in full vigor, the rights and sovereignty of the States, and to confine the action of the general government strictly to the sphere of its appropriate duties."

The supreme courts of the respective States, and of the United States, have uniformly held the same doctrine ; and I shall refer only to a few adjudications of the latter. In the case of *Buckner v. Finley & Van Lear*, (2 Peters, 591,) Washington, J., in delivering the opinion of the court, quoted approvingly from the opinion in the case of *Warder v. Arrell*, (2 Wash. R. 298,) as follows : " The same principle applies, though with no greater force, to the different States of America ; for, though they form a confederated government, yet the several States retain their individual sovereignties, and, with respect to their municipal regulations, are to each other foreign." In the case of *The State of Rhode Island v. The State of Massachusetts*, (12 Peters, 720,) where the question came up for adjudication, Baldwin, J., in announcing the opinion of the court, said : "Before we can proceed in this cause, we must therefore inquire, whether we can hear and determine the matters in contro-

versy between the parties, who are two States of this Union, sovereign within their *respective boundaries*, save that portion of power which they have granted to the Federal government, and foreign to each other for all but Federal purposes. So they have been considered by this court, through a long series of years and cases, to the present term; during which, in the case of *The Bank of the United States v. Daniel*, (12 Peters, 54,) this court has declared this to be a fundamental principle of the constitution; and so we shall consider in deciding on the present motion." See, also, *The Bank of Augusta v. Earle*, 13 Peters, 590; *License Cases*, 5 Howard, U. S. 504.

I am not aware of any adjudications at variance with those referred to, upon this question; and they firmly establish the proposition, *that the States, within their respective boundaries, are sovereign, but limited by the powers granted to the Federal government by the national constitution.*

In determining to what extent the sovereignty of the States was limited, and the extent of the powers and sovereignty conferred on the Federal government, by the constitution, it is just and proper to consult the lessons of contemporaneous history, the wisdom and opinions of the sages who constructed that charter of our national existence and liberties, and the learning and judgment of the jurists and publicists of those and subsequent times.— 12 Peters, 720. The great difficulty which seems to have perplexed the conventionists, was, how to clothe the Federal government with certain supreme, sovereign powers, without bringing it, in its operations, into collision with the State governments, and thereby finally causing the overthrow of the one or the other. An *imperium in imperio* seems to me to be a political anomaly. Yet we have a government, which has been thought to be appropriately characterized by the phrase, *E pluribus unum*. It is different in form and construction from any other known to history. It may, in some of its prominent features, resemble the Achean League, the Republic of Switzerland, the Germanic Confederation, and the Dutch Republic; yet, it is clearly distinguishable from any government where the common law, which is the basis of our jurisprudence, has ever pre-

vailed. I am left, therefore, in exploring the field before me, without precedent or adjudication, applicable to a state of facts which have made their appearance, within the last six years, during a civil war between the general government and a portion of the States, or the people thereof, as to the questions hereafter discussed.

The extent of the limitation of the sovereignty of the States, and of the powers conferred on the general government, must be determined by the provisions of the constitution, subjecting them to the light afforded by the principles of the common and international law. The citizen, under our form of government, is bound to support two constitutions and sovereignties—the State and national. The Divine declaration must be true, "No man can serve two masters; for he will either hate the one, and love the other, or else he will hold to the one, and despise the other." Hence, it results, that one should be supreme, in order to ensure peace, unity, and safety, and to prevent discord, anarchy, and their attendant train of evils.

I proceed to the consideration of the provisions of the constitution, to ascertain what powers were actually conferred on the Federal government, and how far the sovereignty of the States was limited thereby, so far as it is necessary to do so for the purpose of deciding the questions hereafter passed upon in this opinion. It seems to me to be evident from the provisions of the constitution, and the discussions in convention, that it is binding upon the States *as sovereignties ;* but the general government must enforce its powers and authority by acting directly on the people, and not upon the States. This distinction between a State and the people thereof, is one made by the convention, and has come down to our times. I shall not attempt to show that there is, or is not, a difference between them, which does or does not authorize the distinction. If the national government requires the States, or any one of them, to perform any duty, there is no way for it to compel the State to perform it. It must execute its laws, not on the State, but upon the people thereof. The constitution has required of the States the performance of certain duties, which are necessary to the perpetuation of the govern-

ment in its constitutional orbit; such as the election of senators. Yet, if any or all of the States should decline to make the election, there is no power in the national government to compel the States to make it; and so of other duties. It would seem that the founders of our government, in framing the constitution, acted upon the presumption, that such a government and constitution could only be harmoniously and judiciously administered by patriotic and honest men; and that, when they ceased to be so, they would cease to be worthy of, or capable to conduct, a free and constitutional government; and they therefore did not attempt to provide for such a contingency. It was left to be solved by the inexorable logic of events and human necessities.

The second clause of the sixth article of the constitution, is the principal one which declares and asserts the supremacy of that constitution, and the laws passed in pursuance thereof, over State constitutions and laws; and reads as follows: "This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, *anything in the constitution or laws of any State to the contrary notwithstanding.*" Accepting the constitution and the laws made in pursuance thereof as the supreme law of the land, and the sovereignty of the States as limited thereby, the difficulty of determining when the State and national governments are acting within their allotted orbits, *remains.* But, when the laws of the latter are ascertained to be constitutional, they are, at least then, the supreme law of the land. There is, or may be, a class of laws enacted by the States, which may not be a violation of the *letter*, but of the *spirit or policy* of the Federal constitution; and which, when construed in connection with the article which provides that "The powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," is suggestive of questions difficult of solution. The Federal judiciary are apt to incline in favor of maintaining the con-

stitutionality of the laws of the United States and the powers of that government; and the State judiciary are as likely to incline in favor of the rights and powers of the State. In such a conflict, under the provisions of the 6th article of the constitution, the State judiciary must conform its opinion to that of the national, when known. But, when unknown, the former must act upon its own judgment, after a thorough investigation of the subject.

It has been shown that, by the articles of confederation of 1777, the Union was declared *to be perpetual.* The constitution of 1787 was formed for the purpose of remedying the supposed defects of the articles of confederation; and the preamble declares, that " we, the people of the United States, in order to form a more perfect union,    *    *    * and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America." This seems to me persuasive if not decisive, to show that the perpetuity of the Union, and the liberty of the people were the main objects to be accomplished by the substitution of the constitution for the articles of confederation. If the latter declared the Union *perpetual,* the framers of the former, in establishing "a more perfect union," did not assail the perpetuity of the Union; on the other hand, if the union of the States, and the liberties of the people, were objects worthy of preservation and perpetuity, they, instead of impairing the bond which bound the Union together, and thereby endangering its existence, *intended,* by strengthening, to make it more perfect and enduring, *and, if possible, perpetual.* They never designed to *legalize* the power of self-destruction, nor leave its exercise either to a part or the whole of the States. The supremacy of the constitution of the United States, and the laws passed in pursuance thereof, is inconsistent, and, in my judgment, wholly irreconcilable with the right of State secession.

The dissolution of a government is a matter of the most serious import. It can not be effected with the facility of that of a league, or partnership, nor with such harmless consequences. The fourth section of the fourth article requires " the United States to guaranty to every State in

this Union a republican form of government." Without attempting to give my view of the proper interpretation of this clause, it seems to me that, if a State has the right to secede, it could defeat the object of this clause, and render it wholly nugatory. Constitutions are formed, as much for the protection of the few, as the many. The latter, in a free country, are usually *disposed*, and *strong* enough, to take care of themselves; and those instruments are intended to prevent and restrain the oppression of the few by the many. The rights of a minority were never intended to be left at the mercy of the majority, by the authors of our government. A minority of the people of a State can not be deprived of their rights, secured by the constitution of the United States, by any *lawful* act of a State, or of the United States.

Having carefully and for a long time considered and investigated this subject, giving due weight to the sovereignty of the States and the provisions of the Federal constitution, I have come to the conclusion, that the doctrine of State secession is not maintainable, and that the grounds upon which it is sought to be established are at war with the constitution in other respects than those hereinbefore designated. *If a State had the right to secede, all or any portion had the same right, and the further right to form such a government as the Confederate States; and if so, then that government had a right to issue treasury-notes to circulate as money, and a contract based on it would be valid by the common law, and the law of nations, and the constitution of the United States could have no effect on the contract.* But, as the State had no right to secede, the national constitution, in contemplation of law, as hereafter shown, was in force over the whole country during the late war, and all contracts must be based upon a consideration, not in contravention of the policy or constitution of the United States, in order to be enforcible in the courts.—*Kennett v. Chambers*, 14 Howard, 38.

Section ten of the second article is prohibitory, and provides, that "no State shall enter into any treaty, alliance, or confederation." This is explicit, and conclusive. It is further declared, that "no State shall emit bills of credit,

make anything but gold and silver coin a tender in payment of debts," and that " no State shall, without the consent of congress, lay any duty of tonnage, keep troops or ships of war in times of peace, enter into any agreement or *compact with another* State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay." These provisions, in my judgment, were applicable to the insurgent States during the late war. If they had succeeded in maintaining their ordinances of secession, and had established their separate existence as a nation, then their courts would have held, that their independence related to the dates of their respective ordinances, and that all transactions subsequent thereto were freed from the influence of the constitution and laws of the United States, and must be tested by the laws of the seceding States.—*McIlvaine v. Coxe's Lessee,* 4 Cranch, 211. But, having failed, the rule hereafter announced must prevail. Under the last cited provisions of the constitution, the compact or constitution of the confederation of the seceding States is a nullity. No act of a State prohibited by the constitution can be held by the courts to be valid. And that compact or constitution can not be looked to for the purpose of validating anything, much less anything in contravention of the policy of the general government; and, as treasury-notes were issued by this confederation to pass as money, and, if anything, were " bills of credit," they must be held to have been issued in violation of the constitution, and therefore illegal ; and this, though the Confederate States were entitled to the rights of belligerents by the *jus gentium.* These notes were made payable after the ratification of a treaty of peace between the belligerents, and will therefore never be payable, and if they ever could be, there would be no one to pay them ; and, if the Confederate States had been authorized as a government *de facto,* and as the States have been decided to be, to charter banks and issue notes to circulate as money, yet they could not issue them payable at a future indefinite day, without doing so in violation of the constitution of the United States ; and, if we were permitted to look be-

Scheible v. Bacho.

yond, *even*, perhaps, in violation of the constitution of the late Confederate States.

Paper, or notes, issued in violation of the constitution, to circulate as money, can not be a consideration to support an executory contract founded on it.—*Craig et al. v. The State of Missouri*, 4 Peters, 410; *Bryan v. The State of Missouri*, 8 Peters, 40. These cases are familiar to the bar and bench, and no further reference to them is necessary. And the fact that such contract is made with the State issuing such paper or certificates, or with a person who obtained them from such State, or from any source, in my opinion, makes no distinction in the applicability of the principle. Besides, the circulation of such paper is as illegal as its issuance, and equally against the policy of the United States. Such notes were issued for the purpose of maintaining and prosecuting hostilities against the national government, and, but for their circulation by the people, would have been worthless. That circulation alone made them effective for the purpose for which they were issued. Hence, all persons who gave them circulation, must be held to have been *in pari delicto* with the issuer; and upon principles settled by the following authorities, and those cited above, I hold that *the loaning* of Confederate treasury-notes during the war was illegal, and the borrower can avoid the contract when sued upon it.—*Yeates v. Williams*, 5 Ark. (Pike,) 684; *Wils v. Hendrix*, 9 Moore, 586; 2 Bing. 314; *Jones v. Randall*, Cowper, 39; *Cope v. Rowland*, 2 Mees. & W. 149; 2 Gale, 231; *Walker v. Chapman*, Lofft. 342; *Grissari v. Clement*, 3 Bing. 432; 11 Moore, 308; 2 Car. & P. 223; *McGregor v. Lowe*, 1 Car. & P. 200; *Thompson v. Powles*, 2 Sim. 194; *Lowes v. Mazzaredo*, 2 Eng. C. L. Rep. 385; *Birch v. Jervis*, 14 Eng. C. L. Rep. 619; *Fisher v. Bridges*, 72 Eng. C. L. Rep. 641; *United States v. Turner*, 2 Peters, 132; *Smith v. Bromley*, Dougl. 670, and note; *Baley v. Tabor*, 5 Mass. 286; *Mitchell v. Smith*, 4 Dallas, 269; *Laudeler v. Andrews*, 2 McLean, 464; *Merrill v. LeGrand*, 1 How. (Miss.) 150; *Cowen v. Boyce*, 5 How. (Miss.) 769; *Downing v. Ringer*, 7 Mis. R. 585; *Hale v. Henderson*, 4 Humph. 199; *Milne v. Huber*, 3 McLean, 212; *Wooten v. Miller*, 7 S. & M. 380; *Adams v. Rowan*, 8 S. & M. 624; *Howell v. Fountain,*

3 Kelly, 176; *Smith v. Barstow*, 2 Dougl. 155; *Orr v. Lacey*, 2 Dougl. 230; *Stebbins v. Leowoolf*, 3 Cush. 137; *Spalding v. Preston*, 21 Vermont, 9; *ib.* 184, 199, 456; *Leavit v. Blatchford*, 5 Barbour, 9; *Smith v. Godfrey*, 8 Foster, (N. H.) 379; *Buck v. Albee*, 26 Vermont, 184; *Barton v. P. J. & W. F. P. Railroad*, 17 Barbour, 397; *Odineal v. Barry*, 24 Miss. 9; *Kennett v. Chambers*, 14 How. (U. S.) 38; *President, &c., v. Spalding*, 12 Barbour, 302; *McGregor v. Railway Company*, 16 Eng. C. L. Rep. 180; *Railroad Co. v. Faunce*, 6 Gill, 68; *Bates v. Watson*, 1 Snead, 376; *Spinks v. Davis*, 32 Miss. (3 George,) 152; *Fire Ass. v. Berghaus*, 13 La. Ann. 209; *Summerlin v. Livingston*, 15 La. Ann. 519; *Hill v. Mitchell*, 25 Geo. 704; *Bless v. Brainard*, 41 N. H. 256; *Smith v. Pinney*, 32 Vermont, 282; *Guenther v. Dewien*, 11 Iowa, 133; 12 Iowa, 398; *Weeks v. Lippincott*, 42 Penn. 474; *Br. Bank v. Crocheron*, 5 Ala. 250; *McGehee v. Powell*, 8 Ala. 827; *Tenison v. Martin*, 13 Ala. 21; *Stanley v. Nelson*, 28 Ala. 514; 1 Parsons on Contracts, 380–82; *Dial v. Hair*, 18 Ala. 798; *Tannis v. Doe*, 21 Ala. 449; *Atwood's Heirs v. Beck*, 21 Ala. 590; *Petit's Distributees v. Petit's Adm'r*, 32 Ala. 288; *Cothran v. McCoy*, 33 Ala. 65; *Evans v. Kittrell*, 33 Ala. 449; *James v. Hendree*, 34 Ala. 488; *Smith v. Johnson*, 37 Ala. 633; *Martin v. Reed*, 37 Ala. 198; *Webb v. Kelly*, 37 Ala. 333. It would extend this opinion too much to attempt a review of these cases.

I proceed to lay down some general propositions, which may aid in the solution of the questions arising out of the transactions of the last six years. Whatever may be our several opinions, as to the best mode of settling those questions, so as to mete out the greatest good to the community, and approximate nearest the attainment of justice, and harmonize the variant and conflicting interests of individuals and society; *still*, we are not permitted to indulge our personal wishes, sympathies, or predilections, but must be guided and conducted to our conclusions by the well-established principles of law. As judges, we can know no justice, nor administer any, but what is the result of the stern and inflexible mandate of the law; and even then we can never attain to the administration of exact justice, but only approximate it, which is the most that can be done in our

present imperfect condition. Such, too, is the nature of wrong, that it is impossible for human tribunals to adjust with exactitude the remedy, and make one the equivalent of the other. Courts are not responsible for the consequences which flow from the correct application of the principles of law to facts and events over which they have no control.

I. The first proposition is, *The national government is one of delegated sovereign powers, and that they were delegated by the people of sovereign States ; which they had the right to delegate, and to retain the remainder to themselves.*

II. *That, as to the sovereign powers delegated to the Federal government, it is supreme over the States and the people thereof.*

III. *That the States, in their sphere of action, are sovereign; and, to that extent, independent of the control of the national government ;* independent, but in a limited sense. The framers of the constitution were too wise to suppose, that, even as to the sovereign powers of the States, such independence would not be more a matter of theory than of substance, *when* they made "the constitution, and laws made in pursuance thereof, the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding."

Whenever the laws of the State and Federal government conflict, the former yields. Such has been the practical working of the system. But it is said, that this should be so only when the national constitution, and laws made in pursuance thereof, are irreconcilable with the constitution and laws of the State. Who is to determine the question between them? I answer, the courts, and, as a final judicial tribunal, the supreme court of the United States, if they have jurisdiction under the constitution; and if not, the State must yield ; for *the action of individual citizens and State authorities must be based upon the presumption, that all laws of the United States are constitutional, until they are decided by the courts not to be so.* It may be asked, if the legislative authority of the several States have not the right to decide for themselves the extent of the powers and sovereignty of the States, and also of those conferred on the

30

general govenment. I answer, they certainly have; but it is not *exclusive* of, nor *conclusive* on, the courts or the national government. They have no right, in my opinion, by their action to nullify the laws of congress, or to enforce their own laws in defiance of the laws of congress, until the courts have pronounced the laws of congress unconstitutional. Any other view, it seems to me, would lead to constant feuds, and end in anarchy and revolution.

IV. *When the State and national governments, in the exercise of their respective powers, come in collision, each has the right to determine the extent and scope of its own powers, until the matter of difference is settled by the supreme court of the United States, if it has jurisdiction under the 3d article of the constitution ; and if it has not, then there is a case in which no judicial remedy is provided by the constitution.* This proposition must be understood as qualified by the one next preceding, and the comments made thereon ; from all which, the necessary and rational conclusion is, that when a question of power arises, the State must yield its right to enforce the obedience of the citizen to its own decision, until a determination in its favor by the supreme court of the United States ; and if that court has no jurisdiction over the matter, then the *only* appeal is to the ballot box, or a resort to the inalienable rights promulgated by the declaration of independence, *that ultima ratio* of a people determined to be free, and worthy to be so.

While I hold that a State has no right to secede from the Union, it seems to me that the constitution has prohibited the general government from invading a State ; and this opinion is founded on the fourth section of the fourth article. But, at the same time, I hold that the general government has the constitutional power to enter *the limits* of a State, by its officers or armies, to enforce on the people thereof the constitutional laws of congress. Without this power and right, the Union would be impotent to enforce an observance of its laws. A right to *invade* a State, involves a right to conquer or subjugate it, which the general government has no constitutional power to do. I use the words *invade* and *State* in the sense in which they are used by the writers on the laws of nations. To enter *right-*

*fully*, with an army, to enforce laws, is not an invasion of a *State* by the general government, within the meaning of the article of the constitution last referred to.

V. *The States did not forfeit their sovereignty by the attempt to secede, and the consequent civil war; and they continued during the civil war, States de jure; and under the national constitution, their existence and sovereignty were inviolable.* Inviolable, because the general government had no constitutional power to destroy the one, or to impair the other. There is no principle of the common law, or international law, which would operate a divestiture of the limited sovereignty of the States, on account of the exercise of the supposed right of secession, and their consequent attitude of armed hostility. The constitution imposes no such penalty or forfeiture. If the States had obtained their sovereignty from the national government, then there might be some plausibility in the position, that they had subjected themselves to a forfeiture of their sovereignty thus obtained, by their hostile and belligerent acts. *The indestructibility of the States cannot be constitutionally assailed by the national government.* The question, whether the officials of the insurgent States were such rightfully or wrongfully during the war, may arise in some other case, and should not therefore be anticipated; and it is not necessary to decide it for any of the purposes within the scope of this case. It seems to me, upon authority, that they were, *at least*, officers *de facto.—Heath v. The State*, 36 Ala. 274, and authorities therein cited; *Lowell v. Flint*, 7 Shep. 401; *Burke v. Elliott*, 4 Ired. 355; *Hooper v. Goodwin*, 48 Maine, 79. And it is well settled, that the rights and responsibilities of third persons remain the same, whether the functions of government are performed by officers *de jure* or *de facto*, however much their own might be affected by the distinction.—*Mayo v. Stonum*, 2 Ala. 390; *McKim v. Somers*, 1 Penn. 297; *People v. Collins*, 7 Johns. 549; 4 Iredell, 355; 3 Scam. 483; 48 Maine, 79; *Cuthbert v. Huggins*, 21 Ala. 349.

VI. *The State being such de jure, and sovereign, as shown herein, every act which it did, or authorized to be done, or which was done by the people thereof, during the war, must be held*

*valid, unless such act was violative of the Federal or State constitution,* or the policy of the government. This State, *durante bello,* being in contemplation of law within the Union, the constitution must be held to have been in force over its entire territory, as the " supreme law of the land ;" and therefore—

VII. *T he courts must enforce the constitution of the United States, by the application of its principles to transactions occurring within the State during the war.* Conceding, for the argument, that the *sometime* Confederate States government was one *de facto,* within or without the limits of a government *de jure,* (such as the United States,) still, having been overthrown and demolished by the latter, the national constitution must be now held to have been in force during the conflict of arms, and must control the courts in the determination of the rights of all persons affected thereby, though such rights arise from transactions within the State, taking place *pendente lite.*

The State and national governments are not separate, though distinct sovereignties—they are blended and interwoven into harmonious unity ; yet, they are co-ordinate, if not co-equal authorities, united by a written constitution, which fixes their relative subordination and supremacy. In the case of *Rose v. Himely,* (4 Cranch, 241,) the chief-justice, speaking of the right of the people of St. Domingo to establish an independent government, said : " It is for governments to decide whether they will consider St. Domingo as an independent nation ; and until such decision shall be made, or France shall relinquish her claim, courts of justice must consider the ancient state of things as remaining unaltered, and the sovereign power of France over that colony as still subsisting." If this must be done while the contest is pending, *a fortiori* it must after it is ended by defeat, and the entire restoration of the national authority. This doctrine is well sustained by reason, and upon authority.—*Dudley v. Folliott,* 3 T. R. 583 ; *Ogden v. Folliott, ib.* 726; *Gelston v. Hoyt,* 3 Wheaton, 946 ; *Kennett v. Chambers,* 14 How. 38 ; *The Prize Cases,* 2 Black's Rep.; Story on Conflict of Laws, § § 244, 245, 246, and authorities cited

in the notes thereto; Wheaton's International Law, by Dana, pp. 77, 374, and notes.

St. Domingo was a colony of France, and Alabama is a State of the Union. This difference, in my opinion, can make no distinction as to the application of the principle. If it is not applicable, then we must adopt one which would allow us to enforce two distinct and belligerent codes of law within the same territory, repugnant to each other. In this matter, law and reason, as usual, are consistent. The party which fails in political revolutions or civil wars must not expect to give law to the successful party; but the latter has the right, and usually exercises it, to declare and enforce its own laws and policy. But such laws must be in conformity to the constitution and the principles of national law. No people, however powerful, has the *right* to violate or disregard these safeguards of the victors and the vanquished. The constitution confers no authority on the national government, to treat the late insurgent States, or the people thereof, as if they had been acquired or subjugated by conquest. They occupy the position of States and citizens reduced to submission and obedience to the laws of the national government over them.

VIII. *All executed contracts must be treated as finally closed, in the absence of fraud, although originally based on an illegal consideration.* Lord Kenyon, in the case of *Hawson v. Hancock,* (8 T. R. 576,) says: "There is no case to be found, where, when money has been actually paid by one of two parties to the other, upon an illegal contract, both being *particeps criminis,* an action has been maintained to recover it back again."—See, also, *Dixon v. Olmstead,* 9 Vermont, 310. This, as a principle, may be too broadly laid down. Upon authority, it seems, a party who has paid money on such a contract, unexecuted on the part of the other, may, before the latter executes it, treat the contract as a nullity, and recover what he has paid.—*Simpson v. Bloss,* 7 Taunt. 246; *Holman v. Johnson,* Cowper, 343; *Allen v. Riscomb,* 2 Lev. 174; *White v. Bank,* 22 Pick. 181; *Wheeler v. Russell,* 17 Mass. 281; *Shefner v. Gordon,* 12 East, 304; *Belding v. Pitkin,* 2 Caines, 149; *Bank v. Merrick,* 14 Mass. 322. And the principle, that money paid on an executed illegal

Scheible v. Bacho.

contract is not recoverable, has received the sanction of this court.—*Vide Black & Manning v. Oliver*, 1 Ala. 449 ; *Tindall v. Childress*, 2 S. & P. 250 ; *Sterrett's Ex'rs v. Kaster*, 37 Ala. 366.

IX. *A mortgage, given to secure the payment of a contract for the loan of Confederate treasury-notes, is founded on an illegal consideration.* The consideration of the note and mortgage being illegal, they must be held to be vitiated thereby, and therefore invalid as a security.

The consequences which may result from the doctrines announced, while it has made me more laborious in my investigations, should not deter me from announcing my convictions of the proper application of the doctrines to the anomalous condition of the country and the entangled web in which it is involved. Hardships will result, from *any* application made of those, or other principles, to recent events and transactions ; and many have been borne by the country, more detrimental and disastrous than any which would take place, if the view I take of the law and its application were adopted.

I have thus given my views on all the points raised in cases which have been before us, and which are now pending, affecting the transactions which took place during the war, and the State legislation during the same time ; and I shall not, therefore, make any further dissent from the opinions of the court in those cases, or such as may hereafter be presented, unless a new point is sprung, not covered by this opinion.

No demurrer was interposed to the bill, and the appellant has not, by the assignment of errors, or in argument, raised the question of the equity of the bill, on the ground that appellee was *particeps criminis* to the illegal transaction which he seeks to avoid. In this state of the case, and under section 2900 of the Code, and the decisions of this court, I am relieved from raising and passing upon that question. A court of equity has the jurisdiction to set aside and cancel a mortgage, and especially when it is being used to cast a cloud over the title of the mortgagee, who is in possession, to the land conveyed thereby.—*Lyon v. Hunt*, 11 Ala. 295 ; *Burt v. Cassety*, 12 Ala. 738 ; *Hunt,*

Scheible v. Bacho.

*Frowner et al. v. Acre, Johnson et al.*, 28 Ala. 593. And a court of equity having jurisdiction over the subject-matter and the parties, this court will not, *ex mero motu*, as a general rule, dismiss the bill, on a ground which was not raised in the court below, nor insisted on in this court. I do not wish to be understood as intimating any opinion upon the validity of such an objection, if it had been raised in this court for the first time.

Having come to the conclusion, that the consideration of the mortgage is illegal, and that a court of equity has the jurisdiction to cancel it, or declare it void, it is unnecessary to notice the other questions so ably and learnedly argued by counsel; or to decide whether, in such a case as this, appellee should be held to do the same equity, as a party who resorts to a court of chancery, to avoid the payment of usurious interest, is required to do ; for the court below has awarded the appellant all that could be legally claimed, by the enforcement of the rule alluded to, in cases of usury. Hence, if the court erred in the decree rendered, it did so without injury to the appellant ; and consequently the decree should be affirmed.

This opinion was prepared by me as the decision of the court, the cause having been assigned to me; but my brethren, disagreeing with me, wrote another opinion, from most of which I dissent. I have not seen proper to change the draft of my original opinion, and conclude with the deprecatory citation : " What is *writ*, is writ,—*would* it were worthier. "

NOTE BY THE REPORTER.—On a subsequent day of the term, in response to an application by the appellee's counsel for a re-hearing, the following opinions were delivered :

A. J. WALKER, C. J.—When this case was first argued, and when the opinions in it were prepared, the validity of executory contracts which were made during the late war, and which were predicated upon a consideration of Confederate money, was a material and important point of the case. The same question arose in other cases, which were under advisement contemporaneously with this. This

case was selected as the one in which to render opinions settling the question as it arose in other cases then before the court, or which might afterwards come before it. In adjudicating the question, my brother BYRD dissented, and my brother JUDGE concurred with me, in maintaining the validity of such contracts. Notwithstanding the difference among the judges in deciding the question, they were unanimous in regarding the decision, when made, as authority upon the point. Accordingly, in other cases, the question has either been passed *sub silentio*, or decided expressly upon the authority of this case. While Judge BYRD still entertains a conviction of the correctness of his opinion, he concurs with the other members of the court in treating the question as settled; and the court unanimously agree, that in considering the petition for a re-hearing, it should be regarded as adjudged upon authority, and as not now open for discussion.

Another point of dissenting opinion among the members of this court has been, whether debts contracted during the war could, consistently with the Federal constitution, be scaled, upon proof of an agreement, or understanding, that payment should be made in Confederate money. That question has been several times decided in the affirmative; and the judges of this court now unanimously regard the question as settled; the judge hitherto dissenting yielding to authority, without acknowledging any error in his convictions as heretofore expressed. Of course, in speaking of the questions as settled, it is not intended to deny the obligation of the court to change its position, in obedience to the authority of the supreme court of the United States, or to a change in the disposition of a majority of the court in reference to it. We therefore consider the petition for a re-hearing upon the hypothesis that those two questions are settled.

An argument in support of the petition for a re-hearing is made, maintaining that Scheible does not deny in his answer the allegation of the bill, that it was understood that payment was to be made in Confederate money; and that, if he does so respond, his answer is overcome by the requisite amount of testimony; and that, at least, it is so

discredited, as to deprive it of all weight as evidence. A majority of the court are of the opinion, that none of those propositions can be sustained. The bill alleges, that at the time when the Confederate money was received by complainant from the defendant, "it was understood that payment was to be made in like currency." The answer alleges, that before the execution of the note and mortgage, and immediately before the loan of the money, the respondent proposed to make the loan without interest, "provided said Bacho would agree to pay to respondent said sum of money, *in current funds*, six months after the war was over;" and that "Bacho distinctly agreed to this proposition," and thereupon received the money. The answer further states, that when the complainant proposed payment, the defendant told him that he knew the "contract between them was that the said sum of money was to be paid, six months after the war, *in current funds ;*" and that he was to pay no interest. Afterwards the answer proceeds as follows : "Respondent denies that he ever proposed to lend money to said Bacho, except in the way before stated. He denies that the understanding was that said sum of money was to be returned in twelve months ; but that it was to be paid as before stated, according to *the said agreement* entered into by and between said Bacho and respondent." In a subsequent part of the answer, the following language is used : "Respondent denies that it was agreed between said Bacho and respondent, when said sum of money was loaned, that payment was to be made in like currency." Argument can add nothing to the demonstration afforded to the inquirer by the foregoing extracts from the bill and answer, that the bill, upon the point of an understanding that payment should be made in Confederate money, is responded to, and contradicted by the answer. Upon this question, the answer must prevail, unless it is contradicted by two witnesses, or by one with corroborating circumstances.—*England & Lee v. Reynolds, Devoe & Co.*, 38 Ala. 370 ; *Easterwood v. Linton*, 36 Ala. 175 ; *Garrett v. Garrett*, 29 Ala. 439.

Furthermore, the answer must prevail over the testimony of one positive witness, unless that witness is supported

by corroborating circumstances, which, when disconnected from the evidence of the witness, would tend to establish those charges which are denied by the answer, and which would, of themselves, be evidence for that purpose.—*Beene v. Randall*, 23 Ala. 514. An answer is not outweighed by proof of facts which are not irreconcilable with its truth and the fairness of the matter stated, especially when each material fact is stated only by a single witness.—*Branch Bank at Decatur v. Marshall*, 4 Ala. 60. An answer is not discredited, unless it is proved to be false in a material matter, by the requisite degree of evidence.—*Pharis v. Leachman*, 20 Ala. 662.

If it is observed, that the witness Conway was present at the time when the note and mortgage were executed; and that the loan of money, and the verbal agreement or understanding as to the time of payment and currency in which payment was to be made, of which defendant speaks, was entered into previously, and on a different occasion; it will be obvious that Conway's testimony is not opposed to any *material* statement of the answer. With this single remark, we leave the question, whether the evidence, which will be set out *by the reporter*, overcomes or discredits the answer, according to the principles above set forth. We do not think the answer is overcome, or discredited; but we will not farther discuss the question.

The complainant sets up a parol agreement, or understanding, variant from the written instrument. The *onus* of showing it is upon him. In determining whether the answer is discredited, the entire scope of its statement, upon each subject, should be considered. It should be observed, that the answer alleges that the agreement was made under respondent's expressed belief, that the war could not last more than six months. If the expectation that the war would continue for only six months was realized, the understanding that payment should be made six months after the close of the war, would have been substantially carried out by a note payable in twelve months.

The petition for a re-hearing is overruled.

JUDGE, J.—I concurred in the opinion as first deliv-

Scheible v. Bacho.

ered in this case by the Chief-Justice; and I still concur in
that portion of it relating to the validity of executory con-
tracts, of which Confederate money was the consideration.
And on the application for a re-hearing, I am opposed to a
disturbance of that part of the original opinion, which set-
tles the question as to the validity of such executory con-
tracts. Indeed, the application for a re-hearing does not
seek to disturb our decision of that question; but is predi-
cated exclusively upon the ground, that the original opin-
ion is erroneous in this, to-wit: in holding that the evi-
dence, under the pleadings in the cause, is not sufficient to
show that it was the express or implied understanding be-
tween the parties, at the time the money was loaned, and
the bond and mortgage executed, that the money which was
loaned in Confederate currency, was to be paid in the same
currency. A more careful examination of the record, since
the application for a re-hearing has been made, has resulted
in a thorough conviction on my part that the original opin-
ion is wrong, as to this point, and that it should be changed.
I shall proceed to state, briefly, the reasons for my conclu-
sion.

It is averred in the bill, that on the 20th of October,
1863, the complainant Bacho borrowed of the defendant
Scheible four thousand dollars in Confederate States treas-
ury-notes, with the understanding that it should be returned
in twelve months; that pursuant to agreement between the
parties, Bacho, in consideration of the loan, executed his
promissory note to Scheible for the sum of four thousand
dollars, bearing date the 20th of October, 1863, and made
payable on the first day of November, 1864, and also a
mortgage on certain real estate in the city of Mobile, of
the same date as the note, to secure the payment thereof
according to its tenor and effect. It is further averred in
the bill, that the estimated value of Confederate money, at
the time of the loan, was twelve dollars in said currency
for one in gold or silver coin; "that at the time it was re-
ceived, it was understood that payment was to be made in
like currency;" that for the use of the money Bacho was
to pay to Scheible "one barrel of lard, which, according to
its then valuation, was more than lawful interest on the

money loaned;" and that at the maturity of the note, Ba-
cho tendered Confederate money in payment thereof, ac-
cording to the contract; and that Scheible refused to receive
it. These are, in substance, the allegations of the bill bear-
ing on the question under consideration.

Scheible admits, in his answer, that the money loaned
was Confederate treasury-notes; but says it was the agree-
ment that the loan was to be without interest, and that the
sum was to be returned to him "in current funds, six months
after the war was over, meaning the war between the Uni-
ted States and the Confederate States." He admits the
execution of the note and mortgage by Bacho, but says he
"is a foreigner by birth, and could not write the English
language, nor read it understandingly;" that he "did not
read the note and mortgage, nor was either read to him;"
that he received the note and mortgage, and had the mort-
gage recorded; and that he "supposed they were drawn ac-
cording to the agreement." He denies "that the understand-
ing was that said sum of money was to be returned in
twelve months," but says "it was to be paid, as before
stated, according to the said agreement entered into by and
between said Bacho and himself." "He denies that he
was to receive, or did receive, one barrel of lard for the use
of said sum of money for twelve months, or any other time;"
but admits "that, some time after said sum of money was
lent as aforesaid, said Bacho made him a present of one
hundred and forty pounds of lard;" and he denies that it
was agreed between said Bacho and himself, "when said
sum of money was loaned, that payment was to be made
in a like currency." These are believed to be the material
allegations of the answer, relating to the question under
consideration.

Now, the answer denies that it was "agreed" when the
money was loaned "that payment was to be made in a like
currency." The bill says, as will be seen, not that such
was the agreement, but that such was the "understanding"
between the parties. The answer, therefore, instead of
being an express denial of the allegation of the bill in this
respect, is evasive—is, at best, but an evasive denial. But,
admitting for the purposes of the argument that the answer

does directly deny the allegation of the bill in question, still, the rule is, that when an answer is responsive, *if it be contradicted, or disproved, as to a material fact within the defendant's knowledge, it loses its weight as evidence.—Gunn v. Brantley*, 21 Ala. 633. In speaking of the difference between the respective allegations of the parties, as to the words "*understanding*" and "*agreement*," I do not mean to express an opinion as to whether there is, or is not, a difference as to the legal effect of these words, as used in the ordinance. The reference I make to these allegations is for the purpose of showing that the answer *is evasive*.

I now proceed to an examination of the material inquiry, whether, in the present case, the answer of Scheible is contradicted, or disproved, 'as to a material fact within his knowledge. It will not be denied, I presume, that the following allegations of the answer relate to a material fact in the cause : "Respondent being friendly to said Bacho, and being willing and desirous to assist him, told him he would lend him said sum of four thousand dollars, to enable him to purchase said house and lot, without charging any interest upon said sum, provided said Bacho would agree to pay to respondent said sum of money, in current funds, six months after the war was over, meaning the war between the United States and the Confederate States; that said Bacho distinctly agreed to this proposition, and thereupon respondent counted and delivered to him four thousand dollars in notes of the Confederate States." And further—"That respondent and said Bacho went to the office of George Conway, esq., who was told by said Bacho what was wanted, and respondent returned to his business; and in the evening of the same day, according to the best recollection of respondent, said Bacho handed said note to respondent; that respondent did not read said mortgage nor note, nor was either read to him; and *respondent supposed it was drawn according to said agreement*."

It is true, parol evidence would not have been competent to vary the terms of the note and mortgage, as to the *time of payment* of the former; but it would have been competent to prove the allegations of the answer above copied, for the purpose of disproving the allegation of the bill that

the money loaned was to be returned *in like currency;* said respective allegations of the parties being wholly irreconcilable. Now, were any of the foregoing allegations of the answer, relating as they do to a material fact within the defendant's knowledge, contradicted or disproved? The allegation as to the time of payment of the money loaned, is flatly contradicted by the note and mortgage; and the allegation that the note and mortgage are variant from the contract as made, and that defendant did not know it when they were executed, is not only wholly unsustained by evidence on the part of the defendant, but is contradicted by the evidence of Conway, who was employed by the parties to draw up the papers, and who swears as follows: "Said Bacho and Scheible together told me how to draw the note and mortgage." And it is a most pregnant circumstance, in disproof of this portion of the answer, that Scheible should have received the note and mortgage, and had the latter recorded himself, and retained the possession of them both twelve months, before finding out that they were variant from his contract in the important respects before named. This he admits in his answer, and says that the tender to him of Confederate currency in payment of the note, at its maturity, was the occasion of his making the discovery. It is unreasonable to suppose that such carelessness and inattention should have been manifested in relation to a business transaction involving so large an amount.

In addition, the facts and circumstances connected with the transaction, disprove the allegation of the answer, that the contract as to time of payment, as shown by the note and mortgage, is untrue; and in disproving this allegation, they also establish the truth of the proposition contained in the bill, that it was, at the time of the loan, understood or agreed, that like currency to that loaned was to be received in payment of the loan; which proposition it is not necessary to establish by two witnesses, or one and strong corroborating circumstances, because the answer is conclusively shown to be untrue, as to a material fact within the defendant's knowledge, viz., as to the time when payment of the money loaned was to be made.

Scheible v. Bacho.

I now proceed to state some of these facts and circumstances. The note, it is true, was made payable in "*dollars ;* but what did the parties understand at the time, by the term " dollars ?" They could not have intended dollars in *gold* or *silver ;* for such, at the time, was not the circulating medium of the country ; and gold, according to the evidence, " was worth from two and a half to two and three quarters for one ; that is, one hundred dollars in gold were worth two hundred and fifty, or two hundred and seventy-five dollars, in Confederate States treasury-notes." Taking the lowest figures as to its value, if the parties intended that the note should be paid in gold, the complainant was giving the value of *ten thousand dollars* in Confederate currency, for the loan of *four thousand dollars* of the same currency, without interest, for about twelve months ! And this, too, when the value of gold, as compared with Confederate currency, was constantly on the increase. It would be unreasonable to hold such to have been the contract between the parties. For a promissory note of that date for four thousand dollars, *payable in gold,* twelve months after the date thereof, and reasonably well secured, a much larger sum could have been borrowed *in Confederate currency* than *four thousand dollars.*

The parties could not have understood that the note was to be paid in *greenbacks* ; for, if it was not against the law of the Confederacy to circulate, or deal in greenbacks at the time, none were in circulation ; they were, perhaps, a scarcer commodity in the Confederacy than gold itself, and, as compared with Confederate currency, were almost as valuable.

Again, Confederate currency was then the only circulating medium of the country, and all promises to pay *dollars,* based upon business transactions, were understood to mean dollars in Confederate currency ; and this was the case in Mobile, as the evidence shows, notwithstanding the note or paper was made payable at a bank. Such being the general rule, or understanding, in business transactions at the time, it is a legitimate presumption, that the parties did not intend the transaction in question to be an *exception;*

or, if they did, that the exception would have been stated in the contract.

It would be a violent presumption, from all the facts and circumstances, to hold that the parties intended that the note in question should be paid in gold or its equivalent; while it is a natural and legitimate presumption, that they intended it should be paid in the only currency of the country then in use, and upon which business transactions were generally founded.

The fact that it turns out the complainant made a good investment of the currency borrowed, can have no controlling influence upon the question; nither would it have made any difference if he had invested it in "chips and whetstones."

I hold, therefore, that the answer is clearly disproved as to material facts, wholly irreconcilable with the truth of the denial therein that the note given for the money loaned was to be paid in Confederate currency; that being thus disproved, it is not entitled to the weight of evidence in its responsive allegations; and not giving the answer the weight of evidence, the proposition is satisfactorily established, that it was "undestood or agreed between the parties, that the note given for the money borrowed should be discharged by a payment in Confederate currency or treasury-notes."

It is with relutance that I dissent from the opinion of my brothers on such a question; but the strength of my conviction as to the error of their conclusion, and the importance of the question to the complainant in the cause, constrain me to place this, my dissent, upon the record.